THE PEOPLE *ex rel.* THE DEPARTMENT OF PUBLIC HEALTH, Plaintiff-Appellee, v. THELMA E. WILEY, Defendant-Appellant.

First District (3rd Division)    No. 1—02—3529

Opinion filed May 26, 2004.

---

Richard J. Prendergast, Ltd., of Chicago (Richard J. Prendergast and Michael T. Layden, of counsel), for appellant.

Lisa Madigan, Attorney General, of Chicago (Gary Feinerman, Solicitor General, and Nadine J. Wichern, Assistant Attorney General, of counsel), for appellee.

JUSTICE KARNEZIS delivered the opinion of the court:

Plaintiff, the Illinois Department of Public Health (the Department), brought this action against defendant, Thelma E. Wiley, M.D., for defendant's alleged failure to comply with the terms of the medical school scholarship contracts she entered into with plaintiff pursuant to the Family Practice Residency Act (the Act) (110 ILCS 935/1 *et seq.* (West 2002)). The Department alleged that plaintiff breached the contracts and sought triple damages pursuant to section 10 of the Act (110 ILCS 935/10 (West 2002)). The trial court entered summary judgment in favor of the Department, denied defendant's motion for summary judgment and denied defendant's posttrial motion for modification of judgment. Defendant appeals, arguing that the court erred because the parties had a settlement agreement settling all claims under the scholarship contracts; genuine issues of material fact existed regarding whether defendant breached her contractual obligations; and the triple damages were not recoverable under Illinois law in a breach of contract action because they were punitive. We affirm.

## Background

Defendant entered medical school at the University of Illinois in 1985 and graduated in 1989. For each of the four academic years, the Department awarded defendant a scholarship for payment of her tuition, fees and living expenses pursuant to the Act. The purpose of the Act was to establish a program awarding scholarships to eligible medical students who "agree to practice in areas of the State demonstrating the greatest need for more professional medical care. The program shall encourage family practice physicians to locate in areas where health manpower shortages exist and to increase the total

number of family practice physicians in the State." 110 ILCS 935/2 (West 2002). The Department administers the program and promulgated rules and regulations to that end (77 Ill. Adm. Code § 590.10 *et seq.* (2003)).

Defendant executed a "Scholarship Contract" with the Department for each of the four academic years. In exchange for each year's scholarship funds, she agreed to serve as a "full-time primary care physician engaged in direct patient care" in a "designated shortage area" for one year for each year that she received such funds, with a maximum service obligation of three years. The Department maintains a list of approved shortage area practice sites. Repayment of the service obligation would begin 30 days after defendant received her medical license except that service could be deferred until she completed a Department-approved residency program in primary care medicine. In that event, service would begin 30 days after completion of the residency.

The contracts required defendant to obtain the Department's approval of her practice site and, "upon request," to confirm, in writing, the location and office hours of the practice. The Department's rules required her to enter into a contract with the Department approving her service selection as fulfilling the requirements of the Act. 77 Ill. Adm. Code § 590.240(h) (2003). Without such approval, a recipient's "advanced clinical training" or "time in practice" at an unapproved location does not meet the recipient's service obligations. 77 Ill. Adm. Code §§ 590.240(d), (e) (2003).

Pursuant to a triple damages provision in the Act (110 ILCS 935/10 (West 2002)), the contracts provided that, if defendant failed to perform any of the terms and obligations under the contracts, she would have to repay three times the amount she received. Monetary payments were to begin within 30 days after the student failed to perform under the contract and were to be made in equal monthly installments either within the period remaining on the service obligation or as otherwise approved by the Department. If a student failed to pay an installment, the Department could file suit to collect the sums owed and, if successful, collect all costs of the lawsuit from defendant. The contracts required defendant to notify the Department within seven days of any change to her student status, address and/or place of employment.

Defendant testified that she understood all the terms of the contracts at the time she signed them and agreed to those terms. She received a total of $52,465 in scholarship funds over the four years and was obligated to repay the State with three years of service. Defendant obtained approval from the Department to defer her repay-

ment obligation until she completed her internal medicine residency at the University of Illinois Chicago Medical Center. Her residency would be completed in June 1992.

On January 13, 1992, the Department sent defendant a letter stating that it had not received any indication from her regarding her selection of an underserved practice site and encouraged her to contact the Department for assistance with her selection. Defendant testified that she knew that she had to begin her service obligation 30 days after completion of her residency, but that she was interested in pursuing a postresidency fellowship in gastroenterology following her residency. Therefore, in February 1992, prior to the completion of her residency, she contacted Thomas Yocum, the Department's coordinator of the scholarship program, to inquire about pursuing the fellowship. She testified that she told Yocum of her fellowship plans after residency and "it wasn't approved but he indicated that some agreement could be worked out as far as repaying the service." She understood that to mean that "during or after [her] fellowship, [she] would be able to work as a primary care [physician] or in the field of primary care to repay [her] service debt." Yocum told her that "the fellowship would probably not meet the requirements of the [Act], but that her service requirements could be worked out." The Department's rules provide that "[u]pon written approval," service could be deferred until 30 days following completion of a fellowship in a primary care specialty. 77 Ill. Adm. Code § 590.240(c) (2003). Defendant acknowledged that she did not receive written approval from the Department for a fellowship or a concomitant deferment of her service obligation during the fellowship period.

On June 26, 1992, Yocum sent defendant a letter reminding her that she had to start either her service obligation or repayment within 30 days of the end of her residency and requesting notification of her proposed service location so that the Department could verify that it met the service requirements. Defendant did not respond to the letter. Instead, following completion of her residency on June 30, 1992, defendant immediately began a three-year fellowship in gastroenterology at the University of Illinois Chicago Medical Center.

On October 15, 1992, Yocum sent defendant a letter informing her that, since her residency ended in June 1992 and there was "no indication" that she began repaying her scholarship obligation within the requisite 30 days, he assumed that she had "elected" to monetarily repay it. Yocum stated that defendant owed $157,395, triple the amount awarded to her, which had to be repaid over three years, the length of her service term, and that he would send her a repayment contract. On December 2, 1992, Yocum sent defendant four copies of a

monetary repayment contract and requested that she sign and return it as soon as possible. On February 11, 1993, the manager of the Department's accounts receivable unit sent defendant a letter requesting a check for $157,395 within 15 days and informing defendant that, if the check was not received, legal and/or collection procedures would be initiated, and that referral to the State Comptroller's office was an automatic procedure on any accounts referred to a collection agency. Defendant did not respond to any of the letters. She admitted that she had no reason to believe she did not receive them.

According to a Department memo detailing the history of defendant's case, when defendant failed to contact the Department, it referred defendant's case to a collection agency in March 1993, to the Comptroller's office for involuntary withholding on March 24, 1993, and to the Attorney General's office "for action" in April 1993. Defendant confirmed that she did not contact anyone regarding the contracts until the collection agency spoke to her and demanded the $157,395 as a lump-sum payment. Defendant refused to deal with the collection agency and, on April 8, 1993, called Yocum in Springfield. Yocum's memorialization of the call states that he referred her to the Attorney General's office after defendant asked him whether "she could work out something."

Defendant testified that she spoke to the Attorney General's office, discussed how much she could afford to pay and agreed to $100 per month. She stated that she did not agree to pay $157,395 to the Department because her "intent was to still to try to repay [her] debt in service." She made "some agreement for payment but [her] plan was to still try to work out some deal with repaying the service" because she knew that she did not have the money to repay the debt. She stated that she did inform whomever she spoke with that she intended to repay through service. She acknowledged that that person did not indicate that repayment through service was still an option.

On June 24, 1993, the Attorney General's office sent a letter to defendant enclosing an original and a copy of an "Installment Agreement for payment of your debt." The letter requested the defendant sign the original agreement, have it notarized and return it "as soon as possible with [her] first payment of $100.00 which is due July 15, 1993." The "Installment Agreement" stated that defendant owed the State of Illinois $157,395 in accordance with section 20 of the Act. It provided that defendant agreed to pay $100 a month for 24 months and $4,305 per month for 36 months. The first $100 payment was due on July 15, 1993, and subsequent payments were due monthly thereafter. If a payment was not received by a scheduled due date, the entire contract amount would be immediately due and owing. The

contract stated that "[u]pon payment in full, Dr. Thelma E. Wiley shall be entitled to a full release from any further obligation on this matter." Defendant received the letter and contract but did not return the contract, send payment or contact either the Department or the Attorney General's office before the July 15, 1993, due date.

On August 23, 1993, the State Comptroller's office processed a payroll check for defendant. It deducted 25% of the check and on August 24, 1993, sent defendant a letter explaining the withholding and informing defendant of her right to protest the withholding in writing within 30 days. When defendant failed to file a protest, the Comptroller's office sent the withheld funds, $524.56, to the Department, which deposited the check in October 1993.

On September 1, 1993, defendant returned the installment agreement and sent a $100 money order to the Attorney General's office. The Department received the agreement and money order on September 27, 1993, and deposited the funds. The Department continued with the payroll check withholdings because the payments under the installment agreement were already in arrears.

On October 18, 1993, defendant phoned the Department and requested that she be allowed to begin a $100 payment in lieu of the Comptroller's offset withholding. After considering the matter, the Department determined that it would ask the Attorney General's office to "terminate the repayment contract and that in lieu of court action to recover the entire amount, they agree that the Department should continue to offset for $500 monthly." The Department notified defendant on October 22, 1993, that "it was in the best interest of the Department to continue with offset at $500 a month, rather than $100 a month payment through the Attorney General's office and that the Department had requested termination of the repayment contract." On November 1, 1993, the Attorney General "agreed to terminate the repayment contract."

On October 28, 1993, defendant sent a note to the Comptroller's office protesting the involuntary withholdings. She did not contest that she owed $157,395 but rather that the withholdings were done without prior notice to her. She stated that, although it was true that she owed the money, "payment arrangements were already in progress. In fact an installment agreement had been signed by [herself] and Mr. James P. Doran of the Attorney General's office." She enclosed a copy of the installment agreement. The Comptroller's office continued to withhold from defendant's payroll checks through December 1994.

Defendant completed her fellowship in mid-1995 and, since then, has worked full-time as a gastroenterologist, treating digestive and liver diseases, for the Department of Internal Medicine at the

University of Illinois Chicago Medical Center at 1725 West Harrison Street in Chicago and part-time at the Veteran's Administration West Side Medical Center (the VA). She attends an inpatient ward six months a year, attends a general internal medicine ward at the VA one month a year, sees outpatients three half days a week, sees inpatients on a daily basis during the seven months a year she serves as an attending physician, performs endoscopic procedures a half day a week, teaches and does clinical research all year long which overlaps with her other obligations. Defendant considered all aspects of her gastroenterology practice as complying with primary care medicine and her two practice sites to be in underserved areas. She acknowledged that she never received written approval for her practice sites and admitted that she did not contact the Department after the completion of her fellowship in order to discuss beginning her repayment obligation.

On April 17, 1995, the Department filed a two-count verified complaint against defendant seeking $157,395 plus interests and costs. Count I alleged that defendant breached the four scholarship contracts and count II alleged that "on or about September 1, 1993, plaintiff and defendant entered into an 'Installment Agreement' *** for the purpose of settling claims in accordance with [the Act]" and defendant breached the installment agreement.

Finding that the Department abandoned the installment agreement when it chose to terminate the agreement in favor of continuing the involuntary withholding, the court granted defendant's motion to dismiss count II. The parties filed cross-motions for summary judgment on count I, breach of the scholarship contracts. Finding no question of fact concerning defendant's breach of the terms of her contracts, the court granted the Department's motion for summary judgment and awarded the Department $157,395. The court denied defendant's motion for summary judgment and defendant's posttrial motion to modify the judgment to exclude the punitive damages. Defendant timely appealed.

## Standard of Review

A drastic means of disposing of litigation, a motion for summary judgment is granted only when the pleadings, depositions, and admissions on file, together with any affidavits, construed strictly against the movant and liberally in favor of the opponent of the motion, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Purtill v. Hess*, 111 Ill. 2d 229, 240, 489 N.E.2d 867, 871 (1986). We review the trial court's entry of summary judgment *de novo. Axen v. Ockerlund Construction Co.*, 281 Ill. App. 3d 224, 229, 666 N.E.2d 693, 696 (1996).

## Law of the Case

■ Preliminarily, we address defendant's assertion that, because plaintiff did not cross-appeal from the court's dismissal of count II of plaintiff's complaint, that ruling is the law of the case. The court dismissed count II pursuant to defendant's argument that the Department abandoned the installment agreement when it chose to terminate the agreement in favor of collecting the monies owed through involuntary withholding from defendant's payroll checks. Defendant asserts that, as the law of the case, the court's ruling prevents any determination that defendant breached an essential element of the installment agreement amounting to a refusal to perform or abandonment. We disagree that the court's ruling is the law of the case.

"The law-of-the-case doctrine provides 'where an issue has been litigated and decided, a court's unreversed decision on a question of law or fact settles that question for all subsequent stages of the suit.' " *Penn v. Gerig*, 334 Ill. App. 3d 345, 352, 778 N.E.2d 325, 332 (2002), quoting *Norton v. City of Chicago*, 293 Ill. App. 3d 620, 624, 690 N.E.2d 119, 123 (1997). A trial court's order becomes the law of the case only if there is a final appealable order. *McDonald's Corp. v. Vittorio Ricci Chicago, Inc.*, 125 Ill. App. 3d 1083, 1087, 466 N.E.2d 1116, 1119 (1984). A party's failure to challenge a legal decision when it had the opportunity to do so renders that decision the law of the case for future stages of the same litigation. *Liccardi v. Stolt Terminals, Inc.*, 178 Ill. 2d 540, 547, 687 N.E.2d 968, 972 (1997), quoting *Aardvark Art, Inc. v. Lehigh/Steck-Warlick, Inc.*, 284 Ill. App. 3d 627, 632, 672 N.E.2d 1271 (1996).

However, " 'findings of the trial court adverse to the appellee do not require the appellee's cross-appeal if the judgment of the trial court was not at least in part against the appellee.' " *Aardvark Art, Inc.*, 284 Ill. App. 3d at 633, 672 N.E.2d at 1277, quoting *Anderson v. Sutter*, 119 Ill. App. 3d 1070, 1077, 458 N.E.2d 39 (1983). "It is the judgment and not what else may have been said by the circuit court that is on appeal." *Fruit of the Loom, Inc. v. Travelers Indemnity Co.*, 284 Ill. App. 3d 485, 496, 672 N.E.2d 278, 286 (1996). The court's final judgment here, entry of summary judgment in favor of plaintiff on count I, was not adverse to plaintiff in any way. The court awarded plaintiff the entire sum it sought, $157,395, and plaintiff seeks only affirmance of that judgment on appeal. Since the judgment was not adverse to plaintiff, plaintiff was not required to cross-appeal the preliminary ruling dismissing count II and its failure to do so does not render that ruling the law of the case. Accordingly, plaintiff may advance any argument supported by the record to sustain the judgment of the trial court. *Hampton v. Cashmore*, 265 Ill. App. 3d 23, 26, 637 N.E.2d 776, 778 (1994).

## Installment Agreement

■ Defendant first argues that the court erred in denying her motion for summary judgment and granting the Department's motion for summary judgment on count I, breach of the scholarship contracts, because the Department previously settled any claims under those contracts by entering into the installment agreement. Defendant asserts that the installment agreement was a settlement agreement which operated to merge all underlying claims based on the scholarship contracts into the settlement agreement and the Department was, therefore, barred from pursuing any claims under those contracts. We disagree.

A plaintiff's voluntary compromise and settlement of a case for consideration bars him from raising the issues that otherwise could have been raised before the trial court. *Towne v. Town of Libertyville*, 190 Ill. App. 3d 563, 569, 546 N.E.2d 810, 815 (1989). " 'A valid compromise is in the nature of a contract and operates as a merger of all included claims, as well as a bar thereto.' " *Towne*, 190 Ill. App. 3d at 570, 546 N.E.2d at 815, quoting *In re Marriage of Wilder*, 122 Ill. App. 3d 338, 357-58, 461 N.E.2d 447 (1983). After compromising disputed claims, a plaintiff's only remedy is based upon the settlement contract itself. *Towne*, 190 Ill. App. 3d at 570, 546 N.E.2d at 815.

In order for there to be a compromise, the parties agree that " 'a substituted performance is acceptable instead of what was previously claimed to be due; thus, each party yields something and agrees to eliminate both the hope of gaining as much as he previously claimed and the risk of losing as much as the other party [previously] claimed.' " *Collection Professionals, Inc. v. Logan*, 296 Ill. App. 3d 959, 965, 695 N.E.2d 1344, 1348 (1998), quoting 15A Am. Jur. 2d *Compromise & Settlement* § 1 (1976). However, where, as here, "the claim is undisputed and no concessions are made by the *** creditor," there is no compromise. *Collection Professionals*, 296 Ill. App. 3d at 965, 695 N.E.2d at 1348.

There is nothing in the installment agreement to show that the Department surrendered its rights under the scholarship contracts or that the installment agreement was a substitute or compromise of the scholarship contracts. See *Kruse v. Kuntz*, 288 Ill. App. 3d 431, 434-35, 683 N.E.2d 1185, 1187 (1996). Rather, the installment agreement affirmed defendant's obligation to pay the entire amount owed under the scholarship contracts and specified the terms under which that sum was to be repaid. The agreement specifically states that "[u]pon payment in full, [defendant] shall be entitled to a full release from any further obligation on this matter." Clearly, the Department retained the right to pursue alternative remedies until defendant paid the

entire obligation under the scholarship contracts. In essence, the installment agreement was nothing more than the Department's agreement to suspend further action regarding defendant's breach of the scholarship contracts and her failure to repay her obligations thereunder in exchange for defendant's promise to repay such obligations. The Department merely gave defendant extra time in which to monetarily repay her obligation. Nothing in the installment agreement leads this court to believe that a settlement of claims based on those contracts was intended by either party.

This determination is reinforced by defendant's own testimony that she entered into the installment agreement for the sole purpose of stopping the withholding from her payroll checks until she had time to work something out with the Department so that she could repay her obligation through service. She acknowledged her obligations under the four contracts and did not seek to avoid or modify those obligations except for the form of payment.

Defendant makes much of the Department's statement in count II of its verified complaint that "[o]n or about September 1, 1993, plaintiff and defendant entered into an 'Installment Agreement,' *** for the purpose of settling claims in accordance with the [Act]." Defendant argues that the statement constitutes a judicial admission that the installment agreement was a settlement agreement. A fact admitted in a verified pleading is "a formal, conclusive judicial admission which is binding on the pleader and which dispenses wholly with proof of that fact." *Winnetka Bank v. Mandas*, 202 Ill. App. 3d 373, 396, 559 N.E.2d 961, 975 (1990). However, a party is not bound by admissions regarding conclusions of law since it is for the trial court to determine the legal effect of the facts adduced. *Charter Bank & Trust of Illinois v. Edward Hines Lumber Co.*, 233 Ill. App. 3d 574, 579, 599 N.E.2d 458, 462 (1992).

Although the statement is a clear judicial admission of the fact that the parties entered into an installment agreement on or around September 1, 1993, we disagree that it is also a judicial admission that the agreement was a settlement agreement. Construction of a contract is a question of law. *Klein v. Caremark International, Inc.*, 329 Ill. App. 3d 892, 902, 771 N.E.2d 1, 8 (2002). Therefore, the Department's statement was not a judicial admission that the installment agreement was a settlement agreement and it is not bound by its statement. Given our determination that the contract was not a settlement agreement, the Department's claims on the underlying contracts were properly considered by the trial court.

### Breach of the Scholarship Contracts

■ Defendant argues that substantial questions of material fact

exist regarding whether she breached the scholarship contracts. We disagree. Defendant admits that she did not obtain the Department's written approval of her three-year fellowship or a deferment of her service obligation during the term of her fellowship. She also failed to obtain written approval of her gastroenterology practice or her practice locations. She selected her subspecialty and practice locations without consulting with the Department, thereby thwarting the Act's purpose of assigning physicians to the areas most in need of primary care physicians involved in direct patient care. Clearly, if every physician scholarship recipient could practice however and wherever he or she chose, the program would be meaningless. See *Department of Public Health v. Jackson*, 321 Ill. App. 3d 228, 747 N.E.2d 474 (2001) (considering federal cases involving the National Health Service Corps program (42 U.S.C. § 2541 *et seq.* (1988)), a national scholarship program similar to the Act).

The record shows that questions of fact may exist regarding whether defendant's gastroenterology practice is indeed a full-time practice as a primary care physician involved in direct patient care and whether she practiced in an underserved area. However, there is no question of fact that she breached the contracts in other ways. Defendant breached the contracts when she did not (a) obtain the Department's approval of her fellowship, (b) obtain a deferment of her service obligation during her fellowship, (c) obtain approval for her practice at the University of Illinois or VA location, regardless of whether those sites were in underserved areas, and (d) commence repayment of her service obligation within 30 days of the end of her residency as required under the contracts. Accordingly, defendant clearly breached her obligations under the scholarship contracts and the court did not err in awarding summary judgment to defendant.

## Triple Damages

■ Defendant lastly argues that the court erred in awarding triple damages for her breach of the scholarship contracts. Pursuant to section 10 of the Act, a scholarship recipient who fails to fulfill the practice requirement must pay the Department a sum equal to three times the amount of the scholarship grants for each year that the requirement is not fulfilled. 110 ILCS 935/10 (West 2002). The first of the four scholarship contracts, covering the 1986-87 medical school term, states that "in recognition of the injury and damage to people living in designated shortage areas and to the State of Illinois," defendant would be required to pay the triple damages "as penalty for [her] failure to perform." The subsequent three contracts eliminate the two quoted phrases in favor of merely stating that defendant will

be required to pay triple damages if she fails to fulfill her obligations. Under Illinois law, damages are not recoverable in a breach of contract action if the purpose of the contractual damages is merely to secure a party's performance of the agreement. *Hidden Grove Condominium Ass'n v. Crooks*, 318 Ill. App. 3d 945, 947, 744 N.E.2d 305, 307 (2001). Such damages are considered an unenforceable penalty unless the damages are a reasonable forecast of the harm caused by the breach or the harm is difficult or impossible to estimate. *Crooks*, 318 Ill. App. 3d at 947, 744 N.E.2d at 307.

The only case addressing the issue of triple damages awarded pursuant to the Act is *Department of Public Health v. Jackson*, 321 Ill. App. 3d 228, 237-39, 747 N.E.2d 474, 481-83 (2001) (Steigmann, P.J., dissenting). In *Jackson*, the Department filed a breach of contract action seeking triple damages from the defendant, a physician who was obligated to serve three years under various medical school scholarship contracts. Unlike in this case, it was uncontested that the defendant served full-time in a primary care specialty in two designated shortage areas for three years. She did not, however, begin practicing in those shortage areas until almost two years after she completed her residency, did not practice in Illinois during the interim two years and did not obtain written approval from the Department prior to starting her practice in the shortage areas.

The Department argued that it was damaged in that it was deprived of the medical services for which it had bargained and that the defendant was required to work in an area that the Department approved, within the requisite 30 days, and not when and where she felt like practicing. Sixteen months of the three years the defendant practiced in a designated shortage area fell within the first three years after her residency. The Department, therefore, was willing to give the defendant 16 months of service credit for those 16 months, stating that " 'except for the defendant's failure to seek and obtain [the Department's] advance approval of her specific practice site and location, her 16 months of service would have partially fulfilled her contractual service obligation.' " *Jackson*, 321 Ill. App. 3d at 230, 747 N.E.2d at 476. The trial court granted summary judgment to defendant and awarded triple damages. The appellate court reversed on appeal, with Justice Steigmann dissenting.

In analyzing the Act's triple damages provision, the court referred to federal cases interpreting the National Health Service Corps (NHSC) scholarship program (42 U.S.C. § 2541 *et seq.* (1988)), a national scholarship program similar to the Act which also contains a triple damage provision for a scholarship recipient's failure to perform her service obligations. The federal cases held that the damages condi-

tions imposed on the recipients under the NHSC contracts arose from statutory directives rather than a negotiated agreement between the parties and that, therefore, statutory intent rather than common law contract principles should be applied to interpretation of those conditions. Applying statutory construction, the federal courts determined that, given the difficulty in ascertaining what damages resulted from the loss of a trained physician for a three-year period in a medically underserved area, the NHSC statute's triple damages were a " ' "fair and reasonable attempt to fix just compensation in the event of breach." ' " *Jackson*, 321 Ill. App. 3d at 237, 747 N.E.2d at 482, quoting *United States v. Vanhorn*, 20 F.3d 104, 113 (4th Cir. 1994), quoting *United States v. Swanson*, 618 F. Supp. 1231, 1243-44 (E.D. Mich. 1985).

The *Jackson* court accepted the proposition that triple damages are appropriate in cases "where there has been a substantial failure to perform." *Jackson*, 321 Ill. App. 3d at 237, 747 N.E.2d at 482. However, it held that, "[w]here the failure to perform has not been so substantial, *** where the recipient has come close to performance, we reject the proposition that treble damages are a 'fair and reasonable attempt to fix just compensation.' " *Jackson*, 321 Ill. App. 3d at 237, 747 N.E.2d at 482. Applying ordinary contract principles of substantial performance rather than considering statutory intent, the court found it clear that the defendant breached her contract with the Department but nevertheless reversed the order of summary judgment, finding that there remained genuine issues of material fact regarding whether the Department was damaged by the breach, whether the defendant should be entitled to further credit for her three-year practice, whether triple damages were appropriate and whether the defendant was estopped by its conduct from seeking any damages.

We decline to follow the *Jackson* majority. As Justice Steigman states in his dissent, both the Act and the NHSC have virtually identical public policy goals: to address the declining number of physicians in underserved areas by providing scholarships to those physicians who agree to serve in areas that have difficulty in attracting health professionals. *Jackson*, 321 Ill. App. 3d at 237-38, 747 N.E.2d at 482-83. (Steigmann, P.J., dissenting). In aid of these goals, both the Act and the NHSC impose conditions on scholarship recipients. Those conditions, as memorialized in the contracts, arise from statutory directives rather than negotiated agreement and ordinary contract principles do not govern consideration of the validity of those conditions. *Jackson*, 321 Ill. App. 3d at 239, 747 N.E.2d at 483. (Steigmann, P.J., dissenting). "[T]he Illinois General Assembly did not intend for contract principles to govern the interpretation of the relationship

between the Department and a scholarship recipient." *Jackson*, 321 Ill. App. 3d at 239, 747 N.E.2d at 483. (Steigmann, P.J., dissenting). Accordingly, in considering a statutory triple damages provision in a scholarship contract, a party's substantial performance under a scholarship contract or the punitive nature of those damages is not considered. The Department proved the contract, its funding of defendant and that defendant did not obtain approval for her fellowship or practice locations nor serve her obligation within 30 days in accordance with the Act. Therefore, as a matter of law, the Department is entitled to summary judgment and triple damages pursuant to section 10 of the Act (110 ILCS 935/10 (West 2002)). See *Jackson*, 321 Ill. App. 3d at 239, 747 N.E.2d at 483. (Steigmann, P.J., dissenting).

For the reasons stated above, the judgment of the trial court is affirmed.

Affirmed.

SOUTH and HALL, JJ., concur.