Docket No. 98763.

# IN THE
# SUPREME COURT
# OF
# THE STATE OF ILLINOIS

THE PEOPLE OF THE STATE OF ILLINOIS *ex rel.* THE DEPARTMENT OF PUBLIC HEALTH, Appellee, v. THELMA E. WILEY, M.D., Appellant.

*Opinion filed January 20, 2006.*

JUSTICE McMORROW delivered the judgment of the court, with opinion.

Chief Justice Thomas and Justices Freeman, Fitzgerald, Kilbride, Garman, and Karmeier concurred in the judgment and opinion.

## OPINION

The Illinois Department of Public Health (Department) filed suit in the circuit court of Cook County against Thelma E. Wiley, M.D., alleging that Wiley violated scholarship contracts she entered into with the Department pursuant to the Family Practice Residency Act (110 ILCS 935/1 *et seq.* (West 2002)), and that the Department was entitled to treble damages under section 10 of the same statute (110 ILCS 935/10 (West 2002)). The circuit court granted summary judgment in favor of the Department. The appellate court affirmed. 348 Ill. App. 3d 809. For the reasons that follow, we affirm the judgment of the appellate court.

## BACKGROUND

Enacted in 1977, the Family Practice Residency Act (Act) (110 ILCS 935/1 *et seq.* (West 2002)) states that its purpose is to

> "establish a program in the Illinois Department of Public Health to upgrade primary health care services for all citizens of the State, by providing grants to family practice and preventive medicine residency programs, scholarships to medical students and a loan repayment program for physicians who will agree to practice in areas of the State demonstrating the greatest need for more professional medical care. The program shall encourage family practice physicians to locate in areas where health manpower shortages exist and to increase the total number of family practice physicians in the State." 110 ILCS 935/2 (West 2002).

To further this purpose, section 4.03 of the Act (110 ILCS 935/4.03 (West 2002)) authorizes the Department to "establish a program of medical student scholarships and to award scholarships to eligible medical students." An "[e]ligible medical student" is defined, in part, as a person who "agrees to practice full-time in a Designated Shortage Area as a primary care physician one year for each year he or she is a scholarship recipient." 110 ILCS 935/3.07(d) (West 2002). Thus, rather than awarding conventional scholarships, which do not have to be repaid, the Department awards "scholarship contracts," whereby students agree to a service commitment in exchange for receiving funds for medical schooling.

In addition to authorizing the creation of scholarship contracts, the Act also includes a penalty provision for scholarship recipients who fail to fulfill their statutory service obligation. Section 10 of the Act states that if a scholarship recipient fails to fulfill the obligation of serving as a full-time primary care physician in a designated shortage area, then the recipient "shall pay to the Department a sum equal to 3 times the amount of the annual scholarship grant for each year the recipient fails to fulfill such obligation." 110 ILCS 935/10 (West 2002).

In the case at bar, Wiley attended medical school from 1985 through 1989. During each of her four years of school, Wiley entered into a scholarship contract with the Department as authorized by the Act. The combined amount of the scholarships awarded to Wiley

˘2˘

during the four years totaled $52,465.

Although the language in portions of the four contracts varies somewhat, the central obligation under the agreements is the same. Each contract states that, in exchange for receiving scholarship funds, Wiley agrees

> "to serve as a full-time primary care physician in direct patient care in only the designated shortage areas in Illinois approved as a practice site(s)."

Each of the four contracts also contains the following provision regarding the starting date of Wiley's term of service:

> "Student's service term shall begin within thirty (30) days of Student's licensure to practice medicine, except that service may be deferred until completion of an approved residency program in primary care. In all cases where service is deferred, service shall begin within thirty (30) days after Student leaves residency program."

In addition, each of the contracts states that the Act is fully incorporated into the terms of the agreements and that, if the student fails to fulfill the terms of the contract, the Department is entitled to three times the amount of the scholarship awarded. Finally, each contract states that, if the student is required to reimburse the Department monetarily, then "[p]ayments shall begin within 30 days" from the date when the failure to perform occurs.

Wiley graduated from medical school in June of 1989. A month after her graduation, she began a three-year residency in internal medicine at the University of Illinois Medical Center at Chicago. The residency program was approved by the Department and thus, under the terms of her scholarship contracts, Wiley's service obligation was deferred until 30 days after the completion of the residency, *i.e.*, until the beginning of August 1992.

In January of 1990, the Department sent Wiley a copy of a directory, prepared by the Department, which listed designated shortage areas in which scholarship recipients could fulfill their service obligations. In a cover letter that accompanied the directory, the Department noted that Wiley could "receive Departmental approval of [her] selected practice location up to 18 months preceding the completion of [her] residency."

In deposition testimony, Wiley stated that sometime near the end

˘3˘

of her residency, she had "at least a couple" of phone conversations with Tom Yocum, the individual in charge of the scholarship program at the Department.[1] Wiley testified that, during these conversations, she told Yocum she was thinking about pursuing a postresidency fellowship at the University of Illinois at Chicago in gastroenterology, a subspeciality of internal medicine dealing with the digestive system. Wiley stated that Yocum told her the fellowship "wasn't approved but he indicated that some agreement could be worked out as far as repaying the service." Wiley understood this to mean that "during or after [her] fellowship, [she] would be able to work as a primary care or in the field of primary care to repay [her] service debt." Wiley also testified that she did not actually apply for the fellowship until speaking with Yocum. According to Wiley, Yocum "indicated that possibly something could be worked out later on" and, after that, she applied for the fellowship. Wiley did not receive any document memorializing her conversations with Yocum. In September of 1991, Wiley signed an agreement with the University of Illinois at Chicago to do the postresidency fellowship.

Six months before Wiley's residency ended, in January 1992, the Department sent Wiley a letter in which it stated that it did not yet have "any indication from [her] regarding [her] selection of an underserved practice site." The Department asked Wiley to "please notify program staff at once" if she had decided upon a practice location, so that the Department would have sufficient time to verify that the practice site met the requirements of her scholarship contracts. The Department also noted that other scholarship recipients were seeking approval of practice locations and that "[t]he time required to locate a site, receive Departmental approval and make final contractual agreements with those at your practice locations is growing short." The Department offered to assist Wiley in selecting a practice location and enclosed a recent copy of the directory listing

---

[1]The appellate court below stated that this conversation took place in February 1992. 348 Ill. App. 3d at 813. However, Wiley's deposition testimony placed the conversation sometime prior to September 1991.

designated shortage areas. Wiley did not respond to this letter.

Just prior to the end of her residency, in June 1992, the Department sent Wiley another letter in which it again stated that she needed to choose a practice location and have it approved by the Department. The Department reminded Wiley that her scholarship obligation was deferred only until the end of her residency and that she would have to begin repaying her obligation, either through service or with money, within 30 days after the residency ended. Wiley did not respond to this letter.

On July 1, 1992, Wiley began her fellowship in gastroenterology at the University of Illinois at Chicago. The fellowship lasted three years, until June 1995.

Three months after she began her fellowship, in October 1992, the Department sent Wiley a letter in which it noted that her service commitment was to have begun in August 1992. The Department stated that, because it had no indication that Wiley had started her service commitment, it presumed that she had "elected to monetarily repay [her] scholarship obligation." The Department noted that Wiley was required to pay three times the amount of scholarships, or $157,395. The Department also stated that it was in the process of preparing a repayment contract for Wiley which it would be sending to her. Wiley did not respond to this letter.

In December 1992, the Department sent Wiley a repayment contract. The contract stated that Wiley had "elected to repay required funds in lieu of completing practice commitment," that the total amount owed, $157,395, would be paid off in 36 installments, and that the first payment was due January 1, 1993. In a cover letter, the Department asked Wiley to sign the contract and return it as soon as possible. Wiley did not return the contract or respond to the letter.

On January 29, 1993, the Department sent Wiley a certified letter which stated that, because she had not responded to any of the Department's previous letters, her account would be referred to a collection agency or the Illinois Attorney General for further action.

On February 13, 1993, the Department's accounts receivable division sent Wiley a letter which again noted that the Department had not received any response to its previous letters and that Wiley had not returned the repayment contracts. The letter stated that the Department "would appreciate a check for $157,395 within the [next]

fifteen (15) days," and that legal or collection procedures would be initiated if the check was not received. The letter also noted that all Department accounts which had to be referred to a collection agency were also automatically referred to the Illinois Comptroller's office for involuntary withholding. Wiley did not respond to this letter.

In March 1993, the Department's collection agency informed the Department that it had contacted Wiley but that she refused to deal with them. Thereafter, the Department referred Wiley's account to the Comptroller's office, requesting that money be involuntarily withheld from Wiley's monthly paychecks to satisfy her payment obligation under the scholarship contracts. The Department also referred the matter to the Illinois Attorney General.

In April 1993, Wiley phoned Yocum to discuss her scholarship contracts. Yocum told her that her case had been referred to the Attorney General and that she should contact the Attorney General's office.

In her deposition testimony, Wiley stated that she contacted the Attorney General's office and spoke to an individual about satisfying her scholarship obligations through a payment plan. Wiley stated that they discussed how much she "could afford right then" and agreed upon $100 a month. Wiley further testified that, although she "made some agreement for payment" with the Attorney General, her "plan was to still try to work out some deal with repaying the service." Wiley stated that she told someone from the Department of her intent to repay her debt with service but that she did not inform anyone in the Attorney General's office. Wiley also acknowledged that whomever she spoke with at the Department indicated that her debt could no longer be repaid with service.

In June of 1993, the Attorney General sent Wiley an "Installment Agreement." The agreement stated that Wiley owed the Department $157,395 and that she would satisfy the debt by paying $100 per month for 24 months, followed by $4,305 per month for 36 months. The first $100 payment was due July 15, 1993, and subsequent payments were due monthly. The agreement also stated that if Wiley failed to make a timely payment, the entire balance would become due immediately. In addition, the agreement stated that "[u]pon payment in full, Dr. Thelma Wiley shall be entitled to a full release from any further obligation on this matter." Accompanying the

installment agreement was a cover letter that asked Wiley to sign the agreement and return it "as soon as possible with [the] first payment of $100.00 which is due on July 15, 1993." Wiley received the installment agreement but failed to return it, and failed to contact the Department or Attorney General's office, by the July 15 due date.

On August 23, 1993, the Comptroller's office sent Wiley a notice that $524.56, or 25% of her monthly paycheck, was being withheld, and would continue to be withheld, until the $157,395 that she owed the Department was paid in full. The notice informed Wiley that she had a right to protest the withholding within 30 days. Wiley did not file a protest and the withheld funds were sent to the Department.

Approximately a week after the involuntary withholding began, on September 1, 1993, Wiley sent a signed copy of the installment agreement to the Attorney General's office, along with a money order for $100. In her deposition testimony, Wiley stated that she could not recall why she was late in returning the installment agreement and sending the first payment. The Department received the installment agreement and money order and credited the funds toward Wiley's outstanding balance. Because the payments under the installment agreement were already in arrears, the involuntary withholding was continued.

On October 18, 1993, Wiley phoned the Department and asked if she could proceed with payments under the installment agreement instead of continuing with involuntary withholding. The Department declined the request. The Department concluded that it would ask the Attorney General to "terminate the repayment contract and that in lieu of court action to recover the entire amount, they agree that the Department should continue to offset for $500 monthly." The Department notified Wiley of its decision on October 22, 1993, stating that "it was in the best interest of the Department to continue with the offset at $500 a month, rather than $100 a month payment through the Attorney General's office and that the Department had requested termination of the repayment contract." The Attorney General agreed to terminate the installment agreement on November 1, 1993.

On October 28, 1993, Wiley sent a protest letter to the Comptroller's office. Wiley wrote that "it is true that the above sum of money [$157,395] is owed." However, she maintained that other

payment arrangements "were already in progress" in the form of an installment agreement with the Attorney General. Wiley also wrote that she "was not notified prior to withholding that such action would occur if payments were late" under the installment agreement.

The Comptroller's office sent a letter to Wiley and the Department on November 4, 1993, acknowledging receipt of the protest letter, asking the Department for a response, and noting that Wiley would have the chance to reply. The Department responded to Wiley's protest with a letter, a memorandum setting forth the history of the matter, and supporting documents. The Department explained to the Comptroller that it was pursuing involuntary withholding against Wiley because she already had not complied with the terms of the installment agreement and because she had been given many opportunities to fulfill her obligations on other terms. Wiley's protest was denied and involuntary withholding continued through December 1994.

In July 1995, after her fellowship was completed, Wiley began working full time as a physician at the University of Illinois Medical Center at Chicago, and part-time at the Veteran's Administration West Side Medical Center. Wiley's practice was in gastroenterology and hepatology, which is a subspecialty of gastroenterology dealing exclusively with liver diseases. In her deposition testimony given in 1997, Wiley stated that her work consisted of attending an inpatient gastroenterology ward six months a year at the University of Illinois at Chicago, attending a general internal medicine ward at the Veteran's Administration hospital one month a year, seeing outpatients three half-days a week, performing endoscopy procedures a half-day a week, and teaching and performing clinical research all year long.[2] Wiley's salary in 1997 was $103,000. Wiley acknowledged that, even after her fellowship ended, she never received approval of a practice location for her service from the Department. She also acknowledged that she did not contact the Department to discuss repaying her scholarship obligations.

---

[2]The record does not indicate what Wiley's current work responsibilities are.

On August 17, 1995, the Department filed a two-count verified complaint against Wiley in the circuit court of Cook County. Count I alleged that Wiley breached the four scholarship contracts by, *inter alia*, failing to serve, within 30 days after her residency, as a full-time primary care physician in a designated shortage area approved by the Department. Count I further alleged that, pursuant to the Act, the Department was entitled to treble damages of $157,395. Count II alleged that "on or about September 1, 1993, plaintiff and defendant entered into an 'Installment Agreement' *** for the purpose of settling claims in accordance with the 'Illinois Family Practice Residency Act' " and that Wiley breached this agreement.

The circuit court concluded that the Department abandoned the installment agreement when it asked the Attorney General to terminate the agreement and then pursued involuntary withholding. Accordingly, the court granted Wiley's motion to dismiss count II.

Wiley and the Department filed cross-motions for summary judgment with respect to count I. The circuit court determined that there was no question of material fact that Wiley failed to fulfill her service obligation because neither the type of medicine she practiced nor the locations where she practiced satisfied the terms of the scholarship contracts and the Act. The circuit court therefore entered judgment in favor of the Department on count I in the amount of $157,395.

On appeal, Wiley argued that the installment agreement was a settlement agreement that merged all claims based on the scholarship contracts and, therefore, the Department was precluded from proceeding under count I. The appellate court rejected this argument, concluding that the installment agreement was a payment plan, rather than a settlement. 348 Ill. App. 3d at 818-19. In addition, the appellate court held that there was no question of material fact that Wiley breached the four scholarship contracts. Specifically, the court held that Wiley "breached the contracts when she did not (a) obtain the Department's approval of her fellowship, (b) obtain a deferment of her service obligation during her fellowship, (c) obtain approval for her practice at the University of Illinois or [Veteran's Administration] location, regardless of whether those sites were in underserved areas, and (d) commence repayment of her service obligation within 30 days of the end of her residency as required

under the contracts." 348 Ill. App. 3d at 820.

The appellate court additionally held that, pursuant to the scholarship contracts and the Act, Wiley was required to reimburse the Department three times the amount of the scholarships awarded. In so holding, the appellate court noted that the treble damages provision in the contracts arose from a statutory directive, rather than through negotiations of the parties. Thus, the appellate court determined that common law contract defenses, such as the doctrine of substantial performance, could not be raised in an attempt to avoid the treble damages requirement. In reaching this conclusion, the appellate court rejected the reasoning of *Department of Public Health v. Jackson*, 321 Ill. App. 3d 228, 237 (2001), wherein the court held that treble damages are appropriate only in cases "where there has been a substantial failure to perform."

ANALYSIS

This case arises from the circuit court's grant of summary judgment in favor of the Department. Summary judgment should be granted whenever the pleadings, depositions, admissions, and affidavits on file, viewed in the light most favorable to the nonmoving party, show that there are no disputed material facts between the parties and that the moving party is entitled to judgment as a matter of law. *Home Insurance Co. v. Cincinnati Insurance Co.*, 213 Ill. 2d 307, 315 (2004). Our review of the circuit court's entry of summary judgment is *de novo*. *Home Insurance Co.*, 213 Ill. 2d at 315.

Installment Agreement

As she did in the appellate court, Wiley argues that the circuit court erred in granting the Department summary judgment on count I of the Department's complaint because the Department settled any and all claims that it had against Wiley under the scholarship contracts when it entered into the installment agreement with Wiley in September of 1993. Wiley contends that, under the doctrine of compromise and settlement, the Department is precluded as a matter of law from pursuing claims under the scholarship contracts that it previously settled. See, *e.g.*, *Towne v. Town of Libertyville*, 190 Ill. App. 3d 563, 569-70 (1989).

"A compromise is an agreement to terminate, by means of mutual concessions, a claim that is disputed in good faith or unliquidated. 15A Am. Jur. 2d *Compromise & Settlement* §1 (1976). 'It involves an agreement that a substituted performance is acceptable instead of what was previously claimed to be due; thus, each party yields something and agrees to eliminate both the hope of gaining as much as he previously claimed and the risk of losing as much as the other party preciously claimed.' 15A Am. Jur. 2d *Compromise & Settlement* §1 (1976)." *Collection Professionals, Inc. v. Logan*, 296 Ill. App. 3d 959, 964-65 (1998). In other words, a compromise is an agreement that a substitute performance will be accepted in place of what was previously claimed to be due each party. An agreement is not one for compromise and settlement, however, if the parties do not dispute the original claim, merely reaffirm their existing obligations, and make no mutual concessions. *Collection Professionals*, 296 Ill. App. 3d at 965.

We agree with the appellate court's conclusion that the installment agreement was a payment plan expressly contemplated by the scholarship contracts and not a settlement of claims under those contracts. See 348 Ill. App. 3d at 818-19. As the Department points out, Wiley agreed in the scholarship contracts that if she did not fulfill her service obligation, she would pay the Department three times the scholarship funds received, or $157,395. Wiley also agreed that, if this occurred, she would enter into another contract with the Department to set forth the terms of payment. Each scholarship contract expressly stated that the terms of the repayment agreement would be in equal monthly installments for three years "or as otherwise approved by the Department."

Consistent with this language, Wiley entered into an installment agreement that required her to pay $100 per month for the first 24 months and then $4,305 per month for the following 36 months. At the time Wiley discussed the installment agreement with the Attorney General's office, she did not dispute that she had not yet fulfilled the service obligation or that she was obligated to fulfill the payment obligation. Further, as the appellate court noted (348 Ill. App. 3d at 818-19), the installment agreement stated that Wiley would be "entitled to a full release from any further obligation on this matter" only "[u]pon payment in full." Wiley and the Department agreed, therefore, that she owed the entire amount due under the scholarship

contracts and that she would be released from her obligations under those contracts only when she fully paid that amount.

All that the installment agreement did, then, was to reaffirm Wiley's existing obligation under the scholarship contracts and provide her with a monthly installment plan to fulfill that obligation. The installment agreement was clearly a means for the Department to enforce its rights under the scholarship contracts, not a means to surrender any of its rights against Wiley in exchange for rights surrendered by her.

Wiley also contends, however, that the Department is precluded from arguing that the installment agreement was not a settlement, based on a statement made by the Department in its verified complaint that Wiley and the Department "entered into an 'Installment Agreement' *** for the purpose of settling claims in accordance with the Illinois Family Practice Residency Act." According to Wiley, this statement shows the Department's intent to enter into a settlement with Wiley and is a binding judicial admission that the installment agreement was in the nature of a settlement contract.

Whether the installment agreement was, in fact, a settlement agreement presents a question concerning the proper interpretation of a contract. The construction of a contract is a question of law. See, *e.g.*, *Farm Credit Bank of St. Louis v. Whitlock*, 144 Ill. 2d 440, 447 (1991) ("The intention of the parties to contract must be determined from the instrument itself, and construction of the instrument where no ambiguity exists is a matter of law"); *Klein v. Caremark International, Inc.*, 329 Ill. App. 3d 892, 902 (2002). As the appellate court below observed, a party is not bound by admissions regarding conclusions of law since it is for the courts to determine the legal effect of the facts adduced. 348 Ill. App. 3d at 819, citing *Charter Bank & Trust of Illinois v. Edward Hines Lumber Co.*, 233 Ill. App. 3d 574, 579 (1992). Thus, as the appellate court correctly concluded, the Department's statement in its verified complaint was not a judicial admission that the installment agreement was a settlement agreement between the parties. 348 Ill. App. 3d at 819. Accordingly, because there was no settlement, the Department was free to pursue the present action against Wiley for breach of the scholarship contracts. See, *e.g.*, *Kruse v. Kuntz*, 288 Ill. App. 3d 431, 435 (1996).

Breach of the Scholarship Contracts

Wiley also argues that the circuit court erred in granting the Department summary judgment on count I because there are material questions of fact as to whether she breached any of the scholarship contracts. As noted, the appellate court rejected this argument, holding that, among other things, Wiley breached the scholarship contracts by failing to work in a location approved by the Department and by failing to begin her service commitment within 30 days of the completion of her residency. 348 Ill. App. 3d at 820.

Each of Wiley's scholarship contracts required her to work as a full-time primary care physician in a designated shortage area "approved as a practice site(s)" by the Department. Each contract also required Wiley to begin fulfilling her service obligation within 30 days of the completion of her residency. Wiley did not fulfill either of these requirements. After her residency, Wiley began a fellowship in gastroenterology at the University of Illinois at Chicago. In her deposition testimony, Wiley acknowledged that Yocum told her the fellowship was not an approved practice location. This fact was confirmed in the Department's January 1992 letter to Wiley, which stated that she did not yet have an approved practice site, and again in the Department's June 1992 letter, which repeated the same statement. Further, Wiley did not obtain the Department's approval for her subsequent position at the University of Illinois at Chicago or with the Veteran's Administration. In addition, Wiley did not begin her service commitment at an approved practice site within 30 days of the completion of her fellowship.

Wiley argues, however, that obtaining approval from the Department for a practice site and beginning her service obligation within the 30 day period are merely "administrative requirements" and that the failure to fulfill those requirements resulted in no harm to the Department. Wiley then points to the common law doctrine of *de minimis non curat lex*,[3] a doctrine which provides that if a breach of contract causes only slight harm, then no remedy exists. See, *e.g.*, *Pacini v. Regopoulos*, 281 Ill. App. 3d 274 (1996) (applying the

---

[3]Meaning, "the law does not concern itself with trifles."

doctrine to a shopping center sale contract where 95% occupancy was required and 94.9953% was achieved); 4 A. Corbin, Corbin on Contracts §946, at 813 (1951). Relying on this doctrine, Wiley contends that she did not breach the scholarship contracts.

The Department, in response, contends that the defense of *de minimis non curat lex* is not available in this case because common law contract defenses may not be applied to contracts whose terms are established by the Act, rather than through negotiations conducted by the parties. In support of this contention, the Department cites to several federal court decisions that discuss the National Health Service Corps scholarship program (42 U.S.C. §§254l through 254s (1988)), a program similar to the one created by the Act. These decisions generally hold that, because the contractual terms and conditions imposed upon a federal scholarship recipient arise from statutory directives, rather than negotiations, common law contract principles are inapplicable. Instead, the governing principle is statutory intent. See, *e.g.*, *United States v. Vanhorn*, 20 F.3d 104 (4th Cir. 1994); *United States v. Melendez*, 944 F.2d 216 (5th Cir. 1991); *United States v. Bloom*, 925 F. Supp. 426 (E.D. La. 1996). In addition, the Department argues that, even if Wiley may raise the doctrine of *de minimis non curat lex* in this case, she cannot prevail because the breaches which she committed were not trivial and real harm was caused.

With respect to the contractual requirements of obtaining approval from the Department for a practice site, and beginning the service commitment within a 30 day period, we agree with Wiley that common law contract principles apply. Each of Wiley's scholarship contracts expressly incorporates the Family Practice Residency Act into the terms of the agreements. The Act, in turn, gives the Department a general power "[t]o establish a program of medical student scholarships and to award scholarships to eligible medical students." 110 ILCS 935/4.03 (West 2002). However, other than the term "[e]ligible medical student" (110 ILCS 935/3.07 (West 2002)) and the treble damages requirement (110 ILCS 935/10 (West 2002)), the Act does not specify what the terms or conditions of the scholarship contract must be. This is in contrast to the detailed scheme set forth in the statutes governing the National Health Services Corps program. See, *e.g.*, 42 U.S.C. §2541(f)(1)(B)(iv) (1988) (the federal scholarship contract must contain a provision that

the recipient agrees to serve in a health professional shortage area "to which he is assigned by the Secretary as a member of the Corps"); see also *Department of Public Health v. Jackson*, 321 Ill. App. 3d 228, 232 (2001) (noting that the Act contains far less detail than the federal statutes that govern the National Health Services Corps program).

Although they are part of Wiley's scholarship contracts, both the requirement that the Department approve of the scholarship recipient's practice site and the 30-day start date are not found in the Act. Because these requirements have not been imposed by the General Assembly, we conclude that ordinary contract principles apply to them and that Wiley may raise the doctrine of *de minimis non curat lex*.

However, while Wiley may invoke this defense, it is not successful here. The requirements that the Department approve the scholarship recipients' practice locations and that the service commitments begin in a timely fashion are critical to the efficacy of the scholarship program. Departmental approval of a practice site is needed to ensure that medical services are being distributed throughout the state and being provided to those who are most in need. The Department must be able to retain control over where and when the scholarship recipients serve or the program will be ineffective and the purpose of the Act frustrated. See *Jackson*, 321 Ill. App. 3d at 232; see also *Vanhorn*, 20 F.3d at 114 (under the National Health Service Corps program, scholarship recipients may not "unilaterally, without proper approval, decide where they wish to serve if the program is to be effective"); *United States v. Duffy*, 879 F.2d 192, 197 (6th Cir. 1989) (if "recipients are able to demand assignment to a particular location, then the purpose of the [federal] scholarship program is defeated"). Wiley's failure to obtain approval of her practice location and begin working within 30 days were not "slight" or "technical" matters. Rather, these were material breaches of core obligations contained in the scholarship contracts. Accordingly, we decline to find that the doctrine of *de minimis non curat lex* is applicable in this case. We therefore affirm the judgment of the appellate court that Wiley breached the scholarship contracts.

Treble Damages

Wiley also contends that the circuit court erred in awarding the Department treble damages. Wiley notes that, under Illinois law, damages may not be recovered in an action for breach of contract if the purpose of those damages is merely to secure a party's performance of the agreement. See *Hidden Grove Condominium Ass'n v. Crooks*, 318 Ill. App. 3d 945, 947 (2001). Such damages are considered "an unenforceable penalty unless: (1) the amount so fixed is a reasonable forecast of just compensation of the harm that is caused by the breach; and (2) the harm caused is difficult or impossible to estimate." *Crooks*, 318 Ill. App. 3d at 947. Wiley argues that the treble damages at issue here are an improper penalty and may not be imposed.

Wiley also relies on *Department of Public Health v. Jackson*, 321 Ill. App. 3d 228 (2001). In that case, the appellate court concluded that treble damages under the Act should be imposed in those instances "where there has been a substantial failure to perform" on the part of the scholarship recipient. *Jackson*, 321 Ill. App. 3d at 237. Wiley maintains that she substantially performed under the scholarship contracts and, therefore, that treble damages are inappropriate.

Wiley may be correct that, at common law, the treble damages provision in her scholarship contracts would be unenforceable. However, we need not consider that issue here because the imposition of treble damages in this case is not governed by common law. Rather, the treble damages are required by statute.

Each of Wiley's scholarship contracts incorporates the Act into the terms of the agreements. In addition, three of the four contracts specifically state that the treble damages requirement is imposed "in accordance with the Family Practice Residency Act." Section 10 of the Act states: "Scholarship recipients who fail to fulfill the obligation described in subsection (d) of Section 3.07 of this Act shall pay to the Department a sum equal to 3 times the amount of the annual scholarship grant for each year the recipient fails to fulfill such obligation." 110 ILCS 935/10 (West 2002). Subsection (d) of section 3.07, in turn, states that an "[e]ligible medical student" is a person who "agrees to practice full-time in a Designated Shortage Area as a primary care physician one year for each year he or she is a

scholarship recipient." 110 ILCS 935/3.07(d) (West 2002). Wiley does not argue that the legislature may not, as a general matter, modify the common law on the issue of damages for breaches of scholarship contracts, nor does she contend that section 10 of the Act is unconstitutional. We are not free to ignore the requirements set forth by the General Assembly in constitutionally valid legislation. Accordingly, we conclude that, so long as the statutory requirements of section 10 of the Act are met, treble damages may be imposed in this case.

Further, we decline to apply the position advanced in *Jackson* that, in determining whether treble damages may be imposed, the relevant inquiry is whether the scholarship recipient failed to substantially perform the scholarship contract. The question in this case is not whether Wiley did, or did not, substantially perform the terms and conditions of her scholarship contracts. Instead, in accordance with sections 10 and 3.07(d) of the Act, the question is whether Wiley (1) practiced full time (2) as a primary care physician (3) in a designated shortage area. See 110 ILCS 935/10, 3.07(d) (West 2002).

The Department contends that there is no question of material fact that Wiley failed to fulfill each of the foregoing requirements. According to the Department, Wiley did not work as a primary care physician because her practice was in gastroenterology, a subspecialty of internal medicine, and hepatology, a sub-subspecialty of internal medicine. The Department also maintains that, even if portions of her practice were in primary care, she was not working as a primary care physician full time. Finally, the Department contends that Wiley was not working in a designated shortage area because her practice locations were not listed in any of the directories of designated shortage areas prepared by the Department.

Wiley, in response, maintains that testimony from expert witnesses obtained during discovery raises questions of material fact as to whether she was practicing full time as a primary care physician. Moreover, Wiley argues that, under the definition of designated shortage area contained in section 3.04 of the Act, she satisfied the requirement that she practice in a designated shortage area as well. We address this latter contention first.

The Act defines a designated shortage area as

"an area designated by the Director as a physician shortage area, a medically underserved area, or a critical health manpower shortage area as defined by the United States Department of Health, Education and Welfare, or as further defined by the Department to enable it to effectively fulfill the purpose stated in Section 2 of this Act. Such areas may include the following:

(a) an urban or rural area which is a rational area for the delivery of health services;

(b) a population group; or

(c) a public or nonprofit private medical facility." 110 ILCS 935/3.04 (West 2002).

Wiley argues that the requirement of designation by the Director of the Department applies only to the first clause in section 3.04, *i.e.*, "physician shortage area," and not to any of the successive clauses. Thus, according to Wiley, the phrase "medically underserved area" is defined independently of any designation by the Director. Wiley then points to Census Bureau statistics, undisputed by the Department, which show that the median family income in the neighborhood where the University of Illinois at Chicago and Veteran's Administration medical centers are located is approximately one-third of the median citywide family income and that 55% of the population in the neighborhood live below the poverty line. Wiley further notes that a large percentage of the patients she treated received public assistance and had no other form of insurance. Wiley argues that it is precisely this type of low-income population that experiences difficulty receiving medical care because of its lack of resources. Thus, according to Wiley, her practice location was in a "medically underserved area" and treble damages are unwarranted. We disagree.

In light of the purpose of the Act, Wiley's reading of section 3.04 is not a reasonable one. Consider, for example, that a large and highly respected research hospital, though located in an impoverished neighborhood, may have no difficulty filling available medical positions because of the salary and career opportunities that those positions provide. A community clinic located in the same neighborhood, however, cannot offer the salaries and career options that the hospital can, and may struggle to hire physicians. The

˘18˘

purpose of the Act is to improve primary health-care services in those areas "where health manpower shortages exist." 110 ILCS 935/2 (West 2002). Although both the large hospital and the community clinic may be located in the same neighborhood, they may face very different levels of "manpower shortages." For this reason, it cannot be left up to the scholarship recipient to determine, on her own, that her statutory service obligation has been met because the neighborhood in which she works is an impoverished one. The purpose of the Act cannot be effectuated unless the Director can designate those places where health services are actually needed. Consequently, we reject Wiley's interpretation of section 3.04. We conclude that a "designated shortage area" means just that–an area designated by the Director of the Department as suffering from a shortage of professional medical care.

In this case, it is undisputed that Wiley's practice locations in gastroenterology and hepatology at the University of Illinois at Chicago and the Veteran's Administration medical centers were not in the directory of designated shortage areas prepared by the Department. Accordingly, Wiley violated section 10 of the Act and the Department is entitled to treble damages. Because we have determined that Wiley was not working in a designated shortage area, we need not consider whether she was working full time as a primary care physician.

## CONCLUSION

For the foregoing reasons, the judgment of the appellate court is affirmed.

*Affirmed.*