2021 IL App (2d) 191095-U
No. 2-19-1095
Order filed March 9, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| ROBERSON CONSTRUCTION, LLC, | ) | Appeal from the Circuit Court |
| | ) | of Ogle County. |
| Plaintiff-Appellant and | ) | |
| Counterdefendant-Cross-Appellee, | ) | |
| | ) | |
| v. | ) | No. 2017-CH-92 |
| | ) | |
| MARY ANNE ELLERBY, ADRIAN N. | ) | |
| HEAD, and RICHARD M. HEAD, | ) | |
| as Successor Co-Trustees of Trust No. H-4471, | ) | |
| | ) | |
| Defendants-Appellees and | ) | |
| Counterplaintiffs-Cross-Appellants, | ) | |
| | ) | |
| (Mary Anne Ellerby, Individually and as | ) | |
| Successor Co-Trustee of Trust No. H-4471, | ) | Honorable |
| Defendant- Appellee and Counterplaintiff- | ) | John C. Redington, |
| Cross-Appellant). | ) | Judge, Presiding. |

JUSTICE BRENNAN delivered the judgment of the court.
Justices Hutchinson and Birkett concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The trial court's determination that no contract existed was not against the manifest weight of the evidence; the trial court did not abuse its discretion by denying Roberson Construction's motion to amend the pleadings to add a claim for *quantum meruit*; and the trial court did not abuse its discretion by denying Ellerby damages and attorney fees for Roberson Construction's violation of the Consumer Fraud and Deceptive Business Practices Act. Affirmed.

¶ 2    Plaintiff, Roberson Construction, LLC (Roberson Construction), filed a first amended, two-count complaint against defendant, Mary Anne Ellerby, (Ellerby), as successor co-trustee of Trust No. H-4471, to foreclose on a mechanics' lien and for breach of contract under a "Home Improvement Agreement" (Agreement) for the improvements to remodel a farmhouse owned by the trust[1] to include the construction of a new garage and a second-floor bathroom and alleging that the Agreement was subsequently modified by various oral change orders that included extra and additional materials and labor toward improvements to the property. Ellerby responded first by denying there were any oral changes beyond the initial contract price of $150,000, and second by filing a two-count counterclaim for breach of contract for overpayment of work, (1) alleging that the parties agreed the work at the property was to include materials and labor for projects described in the list attached as Exhibit 6 for the contract price of $150,000, and (2) for statutory violations of the Illinois Consumer Fraud and Deceptive Business Practices Act (CFA) (815 ILCS 505/1 *et seq.* (West 2016)). At the close of the bench trial, Roberson Construction made an oral motion to amend the pleadings to add a claim for *quantum meruit*, which the court took under advisement and thereafter denied. The court also found the parties never reached a meeting of the minds as to a material element of the Agreement, specifically the scope of work, in order to constitute a valid offer and acceptance and therefore, the court found the Agreement was not a valid and enforceable contract. Without an enforceable contract, the court rendered judgment in

_____

[1] Though the suit originally named as defendants Mary Anne Ellerby, Adrian N. Head, and Richard M. Head, as successor co-trustees of the trust, which owned the farmhouse, Mary Anne Ellerby became the owner of the farmhouse after the trust dissolved and Roberson Construction's work had been completed.

favor of Ellerby and against Roberson Construction on the foreclosure and breach-of-contract claims. As to the counterclaim, because there was no enforceable contract, the court found Roberson Construction was not bound by the initial contract price of $150,000, and thus, it found in favor of Roberson Construction and against Ellerby as to Ellerby's breach-of-contract claim. As to count II, the court found Ellerby proved Roberson Construction violated the CFA but did not award Ellerby damages or attorney fees; however, it awarded Ellerby court costs.

¶ 3　　Both parties contend on appeal that the trial court's determination that the Agreement did not constitute an enforceable contract was contrary to the manifest weight of the evidence. Moreover, neither party disputes the existence of a contract. Roberson Construction argues that a contract can exist and be enforced even though some terms may be missing or left to be agreed upon and, in this case, parol evidence shows the parties mutually agreed to leave open the scope of work, knowing that oral modifications were necessary to include various change orders and that Ellerby agreed to these changes as she clearly made payments for the work which exceeded the initially stated contract price of $150,000. Roberson Construction also appeals the trial court's denial of its motion to amend the pleadings to allow a *quantum meruit* claim to conform to the proofs at the close of the case.

¶ 4　　Ellerby maintains in her cross-appeal that Roberson Construction judicially admitted the scope of work at the property was to include materials and labor for projects listed on Exhibit 6, which was prepared at the time of the formation of the Agreement for the set price of $150,000, and that parol evidence clearly supports the same. Ellerby also cross-appeals from the trial court's failure to award damages or attorney fees despite its determination that Roberson Construction violated the CFA.

¶ 5　　　　　　　　　　　　　　　I. BACKGROUND

¶ 6                                          A. Pleadings

¶ 7                         1. Roberson Construction's First Amended Complaint

¶ 8       The operative complaint is Roberson Construction's April 10, 2018, first amended complaint.  However, Roberson Construction filed an initial two-count complaint for breach of contract and foreclosure on the mechanic's lien on November 30, 2017.  The trial court granted Ellerby's motion to dismiss the initial complaint without prejudice and with leave to replead.  After Roberson Construction filed its first amended complaint, Ellerby again moved to dismiss, but the trial court ultimately denied the motion.  Accordingly, we turn to the allegations in Roberson Construction's two-count first amended complaint against Ellerby for breach of contract and foreclose on the mechanic's lien.

¶ 9       Roberson Construction alleged that, in June 2016, Ellerby entered into the Agreement with Roberson Construction as general contractor for the improvement of property located in Chana. Roberson Construction attached a copy of the agreement to the complaint as well as Roberson Construction's notice and claim for mechanic's lien. Roberson Construction alleged that the improvements to the property were to include "the construction of a new garage and a bathroom on the second floor," and that the Agreement subsequently was modified by the parties pursuant to various oral change orders that included extras and additional materials and labor toward the improvements to the property (the "Modified Agreement"). Roberson Construction further alleged that the oral change orders included, but were not limited to:

          (1) a new vaulted kitchen; (2) new flooring on the main level of the house; (3) a three-
          season room; (4) a new roof; (5) a new deck; (6) a new sidewalk; (7) a new fence; (8) a
          new staircase to the second floor; (9) new exterior doors and windows; (10) a new mud
          room, including a dog-washing station; (11) remolding and trimming; (12) painting and

dry walling; (13) refinishing floors; (14) adding wainscot to the bathroom; (15) adding extra insulation throughout the building; (16) insulating exterior walls; (17) reframing windows; (18) repairing original structure and rafters; (19) repairing roof collar, ties, ceiling, and joists; and (20) framing, dry wall, taping, and finishing around the house, excluding the upstairs closet.

¶ 10    Pursuant to the Modified Agreement, Roberson Construction furnished additional labor and materials for the construction and improvements of the property and hired several subcontractors to assist in the completion of the improvements. Upon Ellerby's request, on December 19, 2016, Roberson Construction ceased work, and, after deducting all credits and payments, Roberson Construction alleged that the sum of $103,583.10 became due and owing under the terms of the Modified Agreement.

¶ 11    Under count I for foreclosure of mechanic's lien, Roberson Construction filed with the Ogle County Recorder of Deeds a Contractor's Notice and Claim for Mechanics Lien, which was recorded on April 19, 2017. Roberson Construction demanded payment, but the amount due remained unpaid and there remained due and owing to Roberson Construction the sum of $103,583.10, together with interest at the statutory rate of 10% per annum beginning December 19, 2016. Under count II for breach of contract, Roberson Construction alleged that there remained due and owing to Roberson Construction the sum of $103,583.10 from Ellerby regarding the improvements to the property; and that Ellerby breached the contract when she requested that all work ceased and then failed to make payments due and owing to Roberson Construction as a result of the improvements to the property.

¶ 12                              2. Ellerby's Counterclaim

¶ 13    Ellerby responded by filing affirmative defenses and a two-count counterclaim, in which she alleged the following. In count I for breach of contract, Ellerby alleged that she entered into the Agreement with Roberson Construction in which they agreed that the work at the property was to include materials and labor for projects as described in the attached list (Exhibit 6); that the contract price for the work at the property was $150,000; that Ellerby paid Roberson Construction a total of $229,708.86 for work at the property; and that Roberson Construction failed to perform all of its obligations under the contract by committing the following breaches, including, but not limited to:

"a. In general, failing to complete the work within an agreed upon time frame and price, including overcharging for labor, material, and fees;

b. Performing work not requested by [Ellerby];

c. Failing to pay subcontractors;

d. Failing to provide lien waiver notices;

e. Fail[ing] to provide sworn statements;

f. Failing to provide written change orders;

g. Demanding payment in excess of the contract price;

h. Requiring [Ellerby] to provide materials herself which should have been included in the contract price; and

i. Requiring [Ellerby] to pay subcontractors who should have been paid by [Roberson Construction]."

As a result of Roberson Construction's multiple breaches, Ellerby alleged that she suffered damages in that she overpaid Roberson in the amount of $79,708.86.

¶ 14    In count II of her counterclaim for violation of the CFA , Ellerby alleged that Roberson Construction engaged in deceptive acts and practices in the context of the project (a) by failing to provide Ellerby with the consumer rights brochure, as mandated by the Illinois Home Repair and Remodeling Act (HRRA) (815 ILCS 513/1, *et seq.* (West 2016)); (b) by failing to provide sworn statements, as mandated by the Mechanics Lien Act (770 ILCS 60/5 (West 2016)); (c) by misrepresenting the cost of, and overcharging for, labor, material, and fees in relation to the project; (d) by failing and refusing to provide Ellerby with requested documentation regarding bids, invoices, or quotes for additional work; and (e) overcharging Ellerby for labor and materials for the project. Ellerby alleged that these deceptive acts and practices occurred in the course of conduct involving the home repair and remodeling industry, resulting in damages to Ellerby of $79,708.86, plus costs. Ellerby further requested that the court award her court costs and reasonable attorney fees.

¶ 15                                  3. Agreement

¶ 16    Both parties attached the Agreement to their respective complaints. The only difference between the two documents is the presence of a property address. Both versions list a contract amount of $150,000, including a down payment of $20,000. But both are completely blank on the scope of work, providing only that the contract price is "subject to modification for Changes (as defined in Section 4), for the labor and material furnished pursuant to this Agreement." Both parties signed the Agreement.

¶ 17    Section 4 of the agreement, titled "Changes," provides in part:

"No changes, additions, alterations, deviations or extras to the Work shall be made without a written Change Order signed by the Client [Ellerby] and Contractor [Roberson Construction], specifying the change to any labor and materials by the Builder, the amount

to be paid by Client and the change, if any, in the time of performance. *** All Change Orders shall be incorporated as part of this Agreement. Client understands and agrees that changes may extend the time of performance."

¶ 18                    4. Answers to Interrogatories (Ellerby's Exhibit #9)

¶ 19    In answering interrogatories issued by Ellerby, Roberson Construction stated that the Agreement "did not specify the items to [be] completed by the remodel, which items were discussed between [Ellerby] and [Roberson Construction]. [Roberson Construction] conveyed to [Ellerby] that the scope of the project, for the original amount listed in the agreement, could cover the following: 1. New garage [,] 2. New bathroom on the second floor [,] 3. Remodel existing kitchen area[.]" Roberson Construction continued: "It was then decided by [Ellerby] to wait until demolition of the current kitchen, walls, ceiling and inside was done to enable a reasonable cost of the project projection based on what was discovered during the teardown. Discussions between [Ellerby] and [Roberson Construction] were held weekly, sometimes daily, throughout the period of May 2016 thru [*sic*] December 2016, regarding the initial project, as well as new projects that arose out of the desire for the work to be done by the client or repair necessary to accomplish tasks because of the age and status of the original building." Roberson Construction further answered Ellerby's interrogatory that projects done at Ellerby's request in addition to the initial scope of the remodel, in consultation with Ellerby, included a list of 24 additional items.

¶ 20                         5. Ellerby's Exhibit #6

¶ 21    Ellerby and her sister-in-law, Carrie Head, both testified at trial that they walked through the farmhouse with Roberson Construction several times discussing the remodeling Ellerby wanted done by Roberson Construction, and Carrie prepared the Agreement as well as a "written scope of work" from those discussions and presented it contemporaneously when Ellerby and

Roberson Construction signed the Agreement. The four-page written document, Ellerby's Exhibit 6, is attached to Ellerby's counterclaim. The heading states Ellerby's name, the address of the property, and the date as "Summer, 2016." The list is divided by room and materials as follows:

¶ 22    "KITCHEN                          MUDROOM

Cabinets & Pulls                      Structural
Countertop                            Dog Wash
Lighting                              Washer and Dryer
Bookcases                             Sink
Appliances                            Doors to Kitchen & Garage
Farm Sink                             Flooring
Faucet                                Lighting
Windows                               Labor
Fireplace Insert
Door to Mudroom
Flooring
Labor
Fireplace Mantel
French Doors to Deck with Transom

NEW GARAGE                            GREAT ROOM

Door to Mudroom and Exterior          Fireplace
Windows                               French Doors
Lighting                              Windows
Garage Door?                          Flooring
Labor                                 Lighting
                                      Wood Stove

SUN ROOM                              MASTER BEDROOM

Windows                               Flooring
Lighting                              Closet
Structural                            Doors to Bedroom & Bath
Flooring
Outdoor Lighting
Front Door

MASTER BATHROOM                       POWDER ROOM

Vanity with Countertop                Sink
Sink                                  Faucet

Shower                                   Toilet
Shower                                   Labor
Toilet
Towel Racks/Hooks
Bump Out Materials
Labor

SECOND FLOOR BATHROOM          SECOND FLOOR BEDROOMS

Shower                                   Refinish Floors
Toilet
Sink
Towel Racks/Hooks

FOUNDATION/BASEMENT            MISC

New Basement Entrance             Drapes & Rods
Reinforce/Shore Up                  Interior Painting
                                         Exterior Painting
                                         Labor on 3 Custom Sink Vanities
                                         New Sump Pump
                                         New Sewer Lines

EXTERIOR                            CONSTRUCTION MATERIALS, ETC

Asbestos Abatement                 Drywall
Siding                                   Electrical
Roof                                     Lumber/Moldings/Trim
Sidewalk                               Excavation
                                         Concrete
                                         HVAC
                                         Demoliton (*sic.*)
                                         Permits"

¶ 23                                B. Trial

¶ 24    The case proceeded to a bench trial in October 2019. Several of the subcontractors,

Roberson, Carrie and Ellerby testified at trial.

¶ 25                           1. Roberson Testimony

¶ 26    Rick Roberson testified that he met Ellerby and Carrie at the property in April 2016 to

perform a walkthrough of the farmhouse. The house had not been lived in for a long time. Ellerby

and Roberson discussed redoing the kitchen and the upstairs bathroom and adding a mudroom and a garage. Ellerby told him that she had a budget of about $150,000 for the project. Roberson did not make it clear to Ellerby that Roberson could not do all of that work for $150,000. Roberson clarified that they were just in the beginning stages of the project and they met a second time to "actually put a contract together."

¶ 27    At the second meeting with Ellerby and Carrie, Roberson testified that Carrie asked if she could draw up a contract. Roberson's counsel asked Roberson if he told Ellerby he would do an entire "scope of work" for a set price for $150,000, to which Roberson replied, "No."

¶ 28    Counsel presented Roberson with the Agreement, which Roberson testified was signed by Roberson and Ellerby. The following colloquy then occurred:

> "MR. ZOLLINGER [(ROBERSON CONSTRUCTION'S ATTORNEY)]: And it was brought to you by [Ellerby] and [Carrie]. What is the project description as to what you're going to do listed in Section 2?
>
> ROBERSON: It's blank.
>
> ***
>
> MR. ZOLLINGER: And does it lack a description as to scope of work?
>
> ROBERSON: There's no description here.
>
> ***
>
> MR. ZOLLINGER: So if I'm looking at this agreement that you signed, how do you know the scope of services?
>
> ROBERSON: It's not—There's nothing there.
>
> MR. ZOLLINGER: When you signed it with the price of $150,000, what were you intending to do?

ROBERSON: It was pretty much open at that point.

MR. ZOLLINGER: What was the $150,000 placed in the contract supposed to cover?

ROBERSON: We talked about doing a garage, extending the kitchen, and building a mud room."

¶ 29    Roberson continued that he did not receive a down payment until after work commenced. He started demolition upstairs in the hall bath within a month after the Agreement was signed. Roberson explained that Ellerby appeared frequently at the site as there were many decisions to be made regarding the project. Ellerby never asked him what his labor charges were. Nor did he ever talk with her about whether the charges would be usual and customary in the business. Roberson described the extent of the construction and remodeling needed to complete the project at the farmhouse. This included, *inter alia*, digging up a foundation, demolishing parts of the house, framing, hiring subcontractors, shingling the roof, designing a new staircase, building a mud room and a four-seasons room, re-wiring and new electrical work, installing flooring and tiling, painting, building a deck, and furnishing materials for the project.

¶ 30    The project ended sometime around Christmas. Ellerby never complained that she was concerned the project was exceeding the originally understood scope.  Roberson Construction received one-half of the down payment on June 13 and the other half on June 27, 2016, Ellerby paid $229,708.86 in total. Roberson did receive a text message from Ellerby that she understood how much extra work and time the farmhouse had needed once demolition started, and she told Roberson not to hesitate to talk money and expenses with her. After demolition unearthed several problems, and Roberson discussed this with Ellerby, Ellerby stated: "Don't worry, I have extra money. It's okay."

¶ 31    Roberson Construction employed six people, including Roberson and a bookkeeper. To the best of Roberson's knowledge, he expended 2,133.5 hours of labor on the job. Roberson Construction first charged $45 per hour, but this changed to $65 per hour. However, he could not recall the exact date this hourly rate changed. Roberson Construction introduced a series of receipts, some of which it had paid and others, to the best of Roberson's understanding, Ellerby had paid directly. Roberson Construction also introduced subcontractors' invoices for the job. Roberson Construction had a final invoice but did not place it with the exhibits.

¶ 32    A final close-out meeting was held at the farmhouse sometime around Christmas to review the billing statements. Ellerby told Roberson that she was not paying Roberson Construction any more money, and at that point Roberson "just got up and walked out of the house." After that, Ellerby never sent Roberson Construction more money, and Ellerby and Roberson Construction had no further dealings or conversations. Roberson Construction then filed a lien for $103,585.10 based on the amount it believed was reasonably owed on the project and giving Ellerby credit for the payments that were made. At the close of his direct examination, Roberson acknowledged that he was not proud of the bookkeeping part of the job and that the invoices could have been done better.

¶ 33    During cross-examination, Roberson reiterated that the Agreement contained "no scope of work" and to Roberson, "that part [of the Agreement was] incomplete." Roberson recalled that the scope of work in the beginning of the negotiations included the upstairs bathroom, extending the kitchen, adding a mud room, and adding a garage. Roberson explained that he walked through the farmhouse several times with Ellerby and had discussions with her about what needed to be done. As to the section of the Agreement dealing with modification for changes, Roberson testified that he never submitted any written change orders. Roberson acknowledged that the project was not

completed by the October 1, 2016, "substantial completion date" stated in the Agreement, and Roberson further acknowledged that the Agreement called for a reduction of the amount owed based upon a delay in completing the project.

¶ 34    Defense counsel showed Roberson Ellerby's Exhibit 8, which Roberson recognized as a similar copy to Ellerby's Exhibit 6, as it listed some of the same items. Roberson testified that, at some point in time he wrote next to the listed items those things which he added to each room. "Like, for instance, new garage, I put three new doors or three new overhead door(s), insulated, opener, keypad, insulated drywall to garage, finished and primed, so that I could—I went down this list as, you know, what actually took place room by room, and that's when this was filled out in my writing." The trial court asked if the notes Roberson wrote on the exhibit were "memorializing in some fashion the original scope of work of the project?" Roberson stated it was not the scope of the work for the project. Roberson testified that the overhead garage door was in the original scope, but the insulation and the drywall were not. Roberson added that the deck was not part of the original scope either, as that was decided later; "things kept getting added in different positions and different places of the house. Like, the wall on her deck was added." To the best of his recollection Roberson reiterated that the exhibit was not presented or prepared at the time he signed the Agreement.

¶ 35    After several more questions regarding what Roberson recollected regarding the scope of work, the court interrupted, stating: "That horse is pretty dead. Let's move on. Let's move on. Just for the record, I understand the testimony to be what [Roberson] had said was that the original scope of the contract was the mud room, the garage, the upstairs bathroom and the kitchen, and that's inconsistent with the items set forth in the first amended complaint."

¶ 36    Roberson agreed he answered interrogatory number 2 that the scope of the project for the original amount listed in the Agreement "could" cover the new garage, a new second floor bathroom, and remodel the existing kitchen area. However, he explained that the kitchen was not alleged in his complaint because it changed from the "very beginning." As Roberson saw it, there were oral modifications of the original scope. For example, one of those additional items not in the original scope in Roberson's mind included a new roof, and another was a new deck. The final amount claimed by Roberson Construction totaled $103,583.10. Ellerby had previously paid Roberson Construction $229,708.86.

¶ 37    On cross-examination, Roberson accepted that after Ellerby paid $229,708.86, she would owe only $18,000 (the difference between Ellerby's "overpayment" and the outstanding balance according to Roberson construction).  Even in response to questions on direct, Roberson was unsure how much he claimed Ellerby owed or how it was calculated. When asked on direct whether the invoices he had in front of him were well under the $229,000 actually paid, Roberson responded "yes, way under." When asked whether this was because the final invoice was never actually given to Ellerby, Roberson responded: "The final invoice isn't here."

¶ 38    Roberson testified that he was not done with the remodeling by October 1, 2016, which was the original date of substantial completion, due to a "conglomerate of changes." Counsel asked Roberson: "And to follow [defense counsel's] logic earlier, under Paragraph 3 he tried to suggest that you were agreeing to accept $150,000 for the labor and material furnished pursuant to this agreement. What labor and material does this agreement say is to be furnished?" Roberson responded: "It's blank."

¶ 39                              2. Carrie's Testimony

¶ 40    Carrie was called as a witness on behalf of Roberson Construction. Carrie formerly owned an interior design company. She had designed and remodeled two full tear-outs of kitchens and had experience in floor planning, artwork, and tile projects. In addition, Carrie worked for a subcontractor and was familiar with oral and written change orders. She assisted Ellerby with the design of the farmhouse's kitchen and had consulted with Ellerby on some other minor projects.

¶ 41    Carrie furnished a template for Ellerby to use as the Agreement because Roberson Construction did not provide Ellerby with a contract. She was present when the Agreement was signed and agreed that the project description on the document was left blank and did not say "see attached." Nevertheless, Carrie encouraged Ellerby to sign the Agreement because, according to Carrie, the project description was attached to the Agreement "in the last three pages" under "the heading Scope of Work."

¶ 42    Carrie testified that she and Ellerby met Rick Roberson at the farmhouse several times; they walked through every room from the basement to the second floor discussing what needed to be done and what Ellerby wanted to have done to every room. When they were discussing adding a vaulted ceiling in the kitchen, Ellerby asked if that would add to the cost of the project, which at that point had been determined to be $150,000, to which Roberson responded "no."

¶ 43    Carrie specified that the three-page documents that she titled "scope of work" was prepared by her at the same time the Agreement was executed on June 1, 2016, and it listed by room what was included. The three of them also discussed the start date and the finish date, which was inserted into the Agreement.

¶ 44                        3. Ellerby's Testimony

¶ 45    Ellerby testified that she had paid Roberson Construction $229,000. She testified that she had paid $79,000 more than initially agreed as she and Roberson Construction approached the end

of the project and Rick Roberson said he needed more money. She did not pay any additional money as she thought more was not justified based on the work that had been completed.

¶ 46   As to the Agreement and Exhibit 6, Ellerby agreed that Exhibit 6 was not incorporated by reference in the Agreement, but testified it was printed out by Carrie and handed to the parties at the time the Agreement was signed.

¶ 47   During the final meeting at the farmhouse, Roberson Construction advised Ellerby that she still owed Roberson Construction $99,000. Ellerby expected she still owed money, probably along the lines of $20,000, but she did not recall saying or thinking that directly at the meeting. Ellerby never recalled saying that "Enough's enough. This isn't working. It's way more than I thought it was going to be." Nor did she recall asking for a sworn statement or a contractor's affidavit for everything that had been completed.

¶ 48   The trial court then asked Ellerby the following:

> "TRIAL COURT: You said there was at least one but probably multiple times that during the course of this project you went to [Roberson] and said that the two of you discussed doing something above and beyond what you believed to be the original scope of the work. Correct?
>
> ELLERBY: Yes.
>
> TRIAL COURT: And on those—On at least one and probably multiple occasions, he said that you said to him, 'How much is it going to cost to do that?' and he said, 'I can't give you an estimate.'
>
> ELLERBY: Yes.
>
> TRIAL COURT: And on those occasions, did you give them, the, permission to do it anyway even though you didn't know what the cost was going to be?

ELLERBY: Yes. When he said he found foundation issues, I knew that had to be done to proceed.

\*\*\*

TRIAL COURT: Why would you agree to have him do work without knowing? I mean, at some point didn't you feel that you could say, 'Listen, this all sounds great but—and I know you can't give me an estimate. Go get me one, and when you can give me an estimate, then we're going to talk more about this.'

ELLERBY: With hindsight that would have been a good way to proceed. I trusted that he had my best intentions—

\*\*\*

—in mind. He said, 'I will make it work.' Several times when I would ask him about something he said, 'I'll make it work.'

TRIAL COURT: Okay. And then the only other area I had was: As I understand the general gist of the defense and the counterclaim, you believe that the items that were set forth in the scope of work exhibit that [Carrie] said she put together based upon your walk-throughs—

ELLERBY: With us, yeah.

TRIAL COURT: I gotcha. But you believe that that work was all to be done under the heading of this $150,000, correct?

ELLERBY: With a few exceptions. I had already purchased the kitchen cabinets, but they're included because they would need to be installed.

TRIAL COURT: Okay. But then I guess the gist of my question is: You then above and beyond that $150,000 paid an additional $79,000, correct?

ELLERBY: Yes.

TRIAL COURT: What did you believe you were buying with your $79,000 that was above and beyond the original scope of work document?

ELLERBY: Well, any kind of removal of the bad foundation, any materials they would have to lay out to solidify that foundation. We talked about labor. He was telling me that it was taking more hours, that Josh and some of the other workers were putting more hours into fixing those problems.

TRIAL COURT: Okay. Anything else that you can think of?

ELLERBY: He told me that he could not reuse some of the doors in the house, that I would need to purchase all new doors. We talked about putting shiplap in the kitchen and bead board up on the ceiling. I did get an estimate on what that would cost[,] and I said, 'Yes, get the beadboard,' and I knew that was going to cost several thousand dollars more."

¶ 49    During cross-examination, Ellerby described the walkthrough discussions she had with Roberson about the scope of work. Ellerby added that they talked about the materials she had purchased for the project at the time. She purchased the kitchen cabinets, the appliances, some dressers to repurpose into vanities for the bathrooms, and a wood stove. When discussing the budget for the project, Ellerby remembered telling Roberson, "This is a stretch, but can you do this for $150,000?" And Roberson responded: "Yes, I can."

¶ 50    On re-direct, Ellerby responded yes and no to whether she understood that the $150,000 was a set price no matter what conditions were found as the work progressed. She stated "[y]es" in that it was what they agreed upon after walking through the house and discussing everything that she wanted done. However, she stated "[n]o," in that common sense told her that anytime one renovated or remodeled, there could be problems and she was told it could possibly go 10% over

budget. Ellerby was aware when they signed the Agreement that conditions might be uncovered that would require changes to the Agreement. Ellerby claimed Roberson Construction overcharged her $79,708.86, less $12,325.68 for approved additions plus liquidated damages of $10,500 for failing to complete the project on time for a total of $77,883.18.

¶ 51                             4. Subcontractor Testimony

¶ 52    Roberson Construction introduced several invoices from work done at the farmhouse through the testimony of various subcontractors it had hired. Lonnie Capes testified his company was hired to do HVAC and plumbing work for a total of $12,785.23. Capes testified that two of the bills had been paid and a third was outstanding. He remembered serving a notice of intent to file a lien on the outstanding amount but did not remember whether he actually did so, as it had occurred three years ago.

¶ 53    Rodney Scott Rodgers testified that he removed gutters, added new gutters and downspouts, and, per the owner's request, added gutter guards. He stated that believed he was owed $1885.

¶ 54    Terry Walker testified that his firm was hired to install floor covering at the farmhouse. He stated that Ellerby purchased most of the floor covering, but he charged for the labor to install the floor covering and to waterproof, to metal edge, to add heat cables, to install subflooring for a dog washing facility, and to underlay and tile in the lower-level powder room. The cumulative amount charged was $8129.32. Though he had not been paid, he had not filed a lien.

¶ 55    Larry Christopher McKinney, who was employed by Lonnie's Carpet Max, testified that the company was owed a balance of $5328.02 for hardwood floor materials, slate tile, wood reducers, and for installation. He recalled that Ellerby called him to come to the farmhouse because

she was having issues with the kitchen floor and he determined that the product was defective. The company ordered new material but refused to replace it until it was paid for the job.

¶ 56    Jerry L. Scheffler, Jr. supplied new doors, base trim, window trim, casing for the windows and doors, ceiling beadboard, jamb material, and other materials associated with those items. He recalled that he sent a lien notice to Ellerby. However, on cross-examination, Scheffler testified that Roberson Construction paid him the amount of $12,664, and there never was a lien filed because the invoices were paid.

¶ 57                            C. Oral Motion to Amend Pleadings

¶ 58    At the close of evidence and prior to final arguments, Roberson Construction orally moved to amend the pleadings to conform to the evidence under section 2-616 of the Code of Civil Procedure (735 5/2-616 (West 2016)) to add an alternate theory of *quantum meruit*. Ellerby objected, and the court instructed the parties to address the request in their written closing arguments.

¶ 59                            D. Trial Court's Ruling

¶ 60    In its written memorandum of opinion and order on the complaint and counterclaim, the trial court found the following. It denied the motion for leave to amend the pleadings to conform with the proofs, explaining "the Court finds no reason in the record to believe that [Roberson Construction] was unaware of the facts which came out at trial in order to suggest prejudice or surprise, nor was there any suggestion that there was good cause that [Roberson Construction] did not have ample opportunity prior to trial to amend the pleading."

¶ 61    The court then addressed whether a valid contract was entered into between the parties. While the court noted that both parties agreed that they entered into a "Home Improvement Agreement" as submitted into evidence, the question remained whether that document constituted

a valid enforceable contract between the parties. The court was concerned with whether the parties ever reached a meeting of the minds in order to constitute a valid offer and acceptance as to a material element of the contract, specifically the scope of work to be performed. Although the court believed that the evidence showed the parties agreed Ellerby would pay $150,000 for "some" work, the court was not convinced that the evidence showed the parties ever agreed as to what the "work" was to be. Without a meeting of the minds as to this substantial element of the contract, the court concluded that the Agreement did not constitute a valid contract between the parties. Thus, without a valid written contract, the court found in favor of Ellerby on count I of Roberson Construction's first amended complaint for foreclosure of mechanics lien and count II on the breach-of-contract claim.

¶ 62    The court next addressed Ellerby's counterclaims. Count I of the counterclaim alleged breach of contract and sought reimbursement for overpayment made by Ellerby to Roberson Construction. This claim was based on the amount Ellerby had paid Roberson Construction in excess of the agreed $150,000 price. Based on the trial court's review of the record and its prior finding that the Agreement did not constitute a valid contract between the parties, the court found that Roberson Construction was not bound by the $150,000 contract price as set forth in the agreement. Further, without a valid contract, the court found that there could be no breach for Roberson Construction's failure to perform the obligations alleged in count I of the counterclaim. Accordingly, the court found in favor of Roberson Construction as to count I of the counterclaim.

¶ 63    Count II of the counterclaims alleged a violation of the CFA. Based on the court's review of the record and the evidence presented, the court found the alleged violations of failing to provide Ellerby with the Consumer Rights Brochure as mandated by the HRRA and failing to provide sworn statements of persons furnishing labor, services, materials, fixtures, apparatus, or machinery

under the Mechanics Lien Act was proved by a preponderance of the evidence. The court found insufficient evidence of economic damages, and it awarded Ellerby court costs only.

¶ 64    Roberson Construction timely appeals, and Ellerby cross-appeals.

¶ 65                                    II. ANALYSIS

¶ 66                                   A. Valid Contract

¶ 67    The trial court found the Agreement between the parties did not constitute a legally enforceable contract because the parties never reached a meeting of the minds as to a material element, specifically the scope of work to be performed. Both parties contend the trial court's determination that the Agreement did not constitute an enforceable contract was contrary to the manifest weight of the evidence, though they continue to disagree as to the scope of the work contemplated by the Agreement.  Roberson Construction argues that, though the contract is silent as to the scope of the work, it is sufficiently detailed where it provides that Roberson Construction will "supply labor and/or materials" for $150,000, and that the parole evidence demonstrates the scope of the work as well as what work was performed due to oral modifications.  Ellerby maintains that the scope of the work was as set forth in Exhibit 6, which she contends was understood to be part of the Agreement at the time it was signed.  She further contends that there were no oral modifications and that all the work completed was encompassed in the $150,000 contract price.  Finally, Ellerby argues that Roberson Construction judicially admitted that the scope of work included materials and labor for the projects listed in Exhibit 6, and that the Agreement disallows oral modifications.

¶ 68    Generally, the standard of review in a bench trial where there are contested facts is whether the judgment is against the manifest weight of the evidence. *Chicago's Pizza, Inc. v. Chicago's Pizza Franchise Ltd. USA*, 384 Ill. App. 3d 849, 859 (2008). "As the trier of fact, the trial judge

[is] in a superior position to judge the credibility of the witnesses and determine the weight to be given to their testimony." *Id.* Thus, "[a] reviewing court will not substitute its judgment for that of the trial court in a bench trial unless the judgment is against the manifest weight of the evidence." *Id.* " 'A judgment is against the manifest weight of the evidence only when the opposite conclusion is apparent or when findings appear to be unreasonable, arbitrary, or not based on evidence.' " *Id.* (quoting *Judgment Services Corp. v. Sullivan*, 321 Ill. App. 3d 151, 154 (2001)).

¶ 69    "The construction of a contract presents a question of law." *Gallagher v. Lenart*, 226 Ill. 2d 208, 219 (2007). Thus, a contract construed as a matter of law by the trial court may be construed independently by a reviewing court, unrestrained by the trial court's judgment. *Fleet Business Credit, LLC v. Enterasys Networks, Inc.*, 352 Ill. App. 3d 456, 469 (2004) (citing *Lewis X. Cohen Insurance Trust v. Stern*, 297 Ill. App. 3d 220, 232 (1998), and *Zale Construction Co. v. Hoffman*, 145 Ill. App. 3d 235, 240 (1986)). Accordingly, our review of a trial court's interpretation of a contract is *de novo*. *Avery v. State Farm Mutual Automobile Insurance Co.*, 216 Ill. 2d 100, 129 (2005). *De novo* consideration means we perform the same analysis that a trial judge would perform. *Asset Recovery Contracting, LLC v. Walsh Construction Co. of Illinois*, 2012 IL App (1st) 101226, ¶ 57.

¶ 70    Here, however, it is not the case that the trial court was simply asked to interpret the contract between the parties. Instead, before being asked to interpret or construe the contract in any way, the trial court necessarily needed to determine the terms of the contract and whether they constituted a valid and enforceable contract in the first place. "Whether a contract exists, its terms, and the parties' intent are questions of fact to be determined by the trier of fact." *Pepper Construction Co. v. Palmolive Tower Condominiums, LLC*, 2016 IL App (1st) 142754, ¶ 81. See also *Hedlund & Hanley LLC v. Board of Trustees of Community College District No. 508*, 376 Ill.

App. 3d 200, 205 (2007). "A trial court's findings of fact will not be reversed unless they are against the manifest weight of the evidence." *Hedlund & Hanley,* 376 Ill. App. 3d at 205 (citing *Eychaner v. Gross*, 202 Ill. 2d 228, 251 (2002)).

¶ 71    Initially, we address Ellerby's contention that Roberson Construction judicially admitted that the scope of work at the property was to include materials and labor for the projects listed in Exhibit 6, which she contends was prepared at the time of the formation of the Agreement, and was to be completed for the set price of $150,000.  In her counterclaim, Ellerby alleged that the parties agreed that the work at the property was to include materials and labor for projects as described in the list attached as Exhibit 6, and that the contract price for the work at the property was $150,000. In its answers to the allegations, Roberson Construction admitted the parties agreed that the work at the property was to include materials and labor for projects as described in Exhibit 6, "but affirmatively state[d] that the allegations do not address contract modifications." Roberson Construction further admitted that "the project included, in part, the materials and labor for projects listed on the attached Exhibit [6] and affirmatively state[d] that additional changes and/or modifications were requested by Mary Anne Ellerby." Additionally, in Roberson Construction's answer to Ellerby's written interrogatories, Roberson Construction responded that "[a]n initial Home Improvement Agreement prepared and tendered by [Ellerby] to Roberson, *** did not specify the items to [be] completed by the remodel, which items were discussed between Mary Anne Ellerby and Rick Roberson. Roberson conveyed to Ellerby that the scope of the project, for the original amount listed in the agreement, could cover the following: 1. New garage[,] 2. New bathroom on the second floor[,] 3. Remodel existing kitchen area." Roberson Construction continued in its written interrogatories that "[i]t was then decided by Ellerby to wait until demolition of the current kitchen, walls, ceiling and inside was done to enable a reasonable cost of

the project based on what was discovered during the teardown. \*\*\* In addition to the original intended scope," Roberson Construction included a list of 21 additional projects "done at the request of Ellerby above the initial scope of the remodel (in consultation with Ellerby)."

¶ 72   Judicial admissions are defined as "deliberate, clear, unequivocal statements by a party about a concrete fact within that party's knowledge." *In re Estate of Rennick*, 181 Ill. 2d 395, 406 (1998). "A fact admitted in a verified pleading is 'a formal, conclusive judicial admission which is binding on the pleader and which dispenses wholly with proof of that fact.' " *People ex rel. Department of Public Health v. Wiley,* 348 Ill.App.3d 809, 819 (2004) (quoting *Winnetka Bank v. Mandas,* 202 Ill. App. 3d 373, 396 (1990)); see also, 2 McCormick on Evidence § 254 (Robert P. Mosteller, 8th ed. 2020).  The courts are split on the standard of review for judicial admissions. See *Pepper Construction Co.,* 2016 Ill App (1st) 142754, ¶ 90 (collecting cases).  Some courts have employed *de novo* review, reasoning that a reviewing judge can decide the legal question of what is "clear" and "unequivocal" just as well as a trial judge. See *North Shore Community Bank and Trust Co.*, 2014 IL App (1st) 123784, ¶ 117.  Others have used the abuse-of-discretion standard, on the theory that the context for the alleged judicial admission is critical, and matters of context are usually left in the first instance to the trial court. See *In re Marriage of Hundley*, 2019 IL App (4th) 180380, ¶ 118.  We need not decide which standard applies as, under either standard, the proffered statements are unclear such that they do not constitute admissions.

¶ 73   The proffered statements made by Roberson Construction are anything but clear as to the scope of work for the Agreement.  Although Roberson Construction answered that the project included labor and materials listed in Exhibit 6, it couched the answer in terms of modifications. Roberson Construction continued to answer in that manner in its remaining responses, stating that the project included, *in part*, the materials and labor for projects listed in Exhibit 6 and that

additional changes and/or modifications were requested by Ellerby, that the Agreement did not specify which items were to be completed by the remodel, that it "*could* cover" a new garage, a new second-floor bathroom, and a renovation to the existing kitchen area, and that 21 additional projects were "done at the request of Ellerby above the initial scope of the remodel." (Emphasis added.) Given the ambiguity of these statements by Roberson Construction as to Exhibit 6, they cannot fairly be said to constitute judicial admissions that the Agreement understood Exhibit 6 to set forth the scope of the work. To the extent the trial court implicitly so found in determining that there was no meeting of the minds as to the scope of the agreement, we agree.

¶ 74 In a similar vein, both Roberson Construction and Ellerby argue that they judicially admitted the existence of a contract. Even assuming that each party admitted that there was a contract they believed to be binding does not remove from the court's purview the question whether the Agreement was a valid and enforceable contract. It is for the trial court to determine the legal effect of the facts adduced. *1550 MP Road LLC v. Teamsters Local Union No. 700*, 2019 IL 123046, ¶ 37 ("It is well established that legal issues cannot be judicially admitted and, instead, are questions for the court to decide."). Whether a valid and enforceable contract exists is of course a question of law. *Northern Illinois Construction Co. v. Zale*, 136 Ill. App. 3d 822, 824 (1985); see also *Wiley*, 348 Ill. App. 3d at 819 (judicial admission did not control determination whether judicially admitted installment agreement was a settlement agreement).

¶ 75 The primary disagreement between the parties, and the ultimate reason for the trial court's conclusion that the parties had no "meeting of the minds," concerns the scope of the work intended by the parties. The Agreement itself left the scope of work blank and sheds no light on the minimum or maximum areas of remodeling, or the amount or type of material, parts, or labor. For a valid contract to be formed, "an offer must be so definite as to its material terms or require such

definite terms in the acceptance that the promises and performances to be rendered by each party are reasonably certain." (Internal quotation marks omitted). *Academy Chicago Publishers v. Cheever*, 144 Ill. 2d 24, 29 (1991) (citing 1 Williston, Contracts §§ 38 through 48 (3d ed. 1957); 1 Corbin, Contracts §§ 95 through 100 (1963)). Although the parties here may have had and manifested the intent to make a contract, if the content of their agreement is unduly uncertain and indefinite, no contract is formed. *Id.* (citing 1 Williston § 37; 1 Corbin § 95). While a contract may be enforced even though some contract terms may be missing or left to be agreed upon, if the essential terms are so uncertain that there is no basis for deciding whether the agreement has been kept or broken, there is no contract. *Id.* at 30.

¶ 76    Both parties rely on parol evidence to demonstrate there was an agreement as to the scope of the work. Roberson Construction argued in the trial court that the "the scope of the work was blank when [Ellerby] gave permission to Roberson Construction to proceed," but that the parties understood generally that the scope included, "Roberson's promise *** to supply labor and materials." Additionally, Roberson Construction asserts that the parties orally agreed to various contract modifications as the project evolved and that Ellerby knew from the beginning that the project would cost more than $150,000. In addition to her contention that Roberson Construction judicially admitted that the scope of work was Exhibit 6, Ellerby relies on her and Carrie's testimony to show that plaintiff knew the scope of work contemplated by the Agreement. Specifically, after several walk-throughs, she asserts that Roberson agreed that the scope of work was as provided in Exhibit 6, which was present at the time of the Agreement's execution and which Roberson understood to be part of the Agreement. Ellerby disputes that she authorized any change orders notwithstanding that she paid Roberson Construction well over the Agreement's $150,000 price.

¶ 77    The parol evidence rule allows extrinsic evidence of additional and consistent terms when the contract appears incomplete or ambiguous on its face. *Kay v. Prolix Packaging Inc.*, 2013 IL App (1st) 112455, ¶ 61. Looking at the four corners of the instrument reveals whether or not it is fully integrated. *Midwest Builder Distributing, Inc. v. Lord & Essex, Inc.*, 383 Ill. App. 3d 645, 661-62 (2007).  Parol evidence is admissible to show a condition precedent to the existence of a contract. *Northern Trust Co. v. Brentwood North Nursing & Rehabilitation Center, Inc.*, 225 Ill. App. 3d 1039, 1042 (1992). "Where a contract is not expressive of the complete agreement and understanding of the parties, consideration of antecedent proceedings does not serve to vary the contract terms but exemplifies the terms of the agreement." *Id.*  "It is well settled that a court, when construing a contract, should ascertain the intent of the parties and give effect to that intent." *Eichengreen v. Rollins, Inc.*, 325 Ill. App. 3d 517, 521 (2001).

¶ 78    In an attempt to determine the parties' intention regarding what constituted the scope of work, the trial court considered evidence of antecedent proceedings between the parties. Ellerby's evidence included that, during their walkthroughs, Ellerby, Roberson, and Carrie discussed what remodeling Ellerby wanted done to the farmhouse. Ellerby and Carrie testified that the parties intended that the Agreement committed Ellerby to pay Roberson Construction $150,000 for all the items set forth in Exhibit 6, and that a copy of Exhibit 6 was presented to Roberson at the time the Agreement was signed. When questioned by the trial court whether she believed that all the work on the list could be performed for the $150,000 price, Ellerby responded "no," and that, when she signed the Agreement, she knew conditions might be uncovered requiring a change.

¶ 79    Roberson testified that when he signed the Agreement the scope of work was pretty much open. He could only recall the parties talking about the second-floor bathroom, extending the kitchen, and building a mudroom and garage. Roberson also stated that Exhibit 6 was not provided

at the time the parties signed the Agreement, and that he considered it more like a "punch list" which he used and added to as he remodeled each room. It was Roberson's position that the 20-plus items costing well over the Agreement's $150,000 price were oral modifications to the Agreement, notwithstanding its prohibition against oral modifications; in support he notes that Ellerby paid some $79,000 over the agreed-to $150,000 price.

¶ 80    After considering the conflicting parol evidence, the trial court concluded that there was no meeting of the minds as to the scope of work to be performed, rendering the written Agreement an unenforceable contract. Although it is not uncommon for a court to supply a missing material term after considering parole evidence, where the evidence suggests that a material aspect of the contract has not been decided upon, courts ordinarily refuse to supply the missing term. *Academy Chicago Publishers,* 144 Ill. 2d at 31 (citing 1 Williston § 42; 1 Corbin § 100). Whether a contract exists between the parties, the parties' intent in forming it, and the contract's terms are all questions of fact. *Hedlund & Hanley*, 376 Ill. App. 3d at 205. Where the evidence is close and the findings of fact must be determined from the credibility of the witnesses, as a court of review, we defer to the trial court's factual findings unless they are against the manifest weight of the evidence. *Kalata v. Anheuser-Busch Companies*, 144 Ill. 2d 425, 433 (1991). Where the evidence conflicts, it is the role of the trial court to resolve that conflict. *Kirkpatrick v. Strosberg*, 385 Ill. App. 3d 119, 129 (2008).

¶ 81    The conflicting testimony of the two principal parties, when considered in conjunction with the documentation, the testimony of the additional witnesses, and the conduct of the parties, supports the trial court's determination that there was no mutual assent as to the scope of the work. As stated, in a bench trial, it is the function of the trial judge, as the trier of fact, to weigh the evidence and make factual determinations. *Kalata*, 144 Ill. 2d at 433. We will not substitute our

judgment for the trial court regarding the credibility of the witnesses, the weight it should have given to the evidence, or the inferences it should have drawn therefrom. *Thompson v. Buncik*, 2011 IL App (2d) 100589, ¶ 26. Considering all the evidence, we cannot say that the trial court's determination that there was no meeting of the minds as to the scope of the work was against the manifest weight of the evidence.

¶ 82    Further, given the trial court's conclusion that there was no meeting of the minds as to the scope of work contemplated by the Agreement, we agree with the court's legal conclusion that the Agreement was not an enforceable contract. An enforceable contract must include a meeting of the minds or mutual assent as to the terms of the contract. *Academy Chicago Publishers*, 144 Ill. 2d at 30. In that the Agreement was not a valid and enforceable contract, Roberson Construction's contract claims regarding the oral change orders necessarily fail as well.

¶ 83                              B. Amendment to the Pleadings

¶ 84    We next turn to Roberson Construction's contention that the trial court abused its discretion where it denied its motion to amend the pleadings at the close of the evidence to conform to the proofs by adding a claim for *quantum meruit* pursuant to section 2-616 of the Code of Civil Procedure (735 ILCS 5/2-616 (West 2016)). *Quantum meruit* exists in the absence of an express contract, and it describes a cause of action seeking recovery for the reasonable value of services non-gratuitously rendered. *Jameson Real Estate, LLC v. Ahmed*, 2018 IL App (1st) 171534, ¶ 61. To recover under *quantum meruit*, a plaintiff must prove: (1) it performed a service to the benefit of the defendant, (2) it did not perform the service gratuitously, (3) the defendant accepted the service, and (4) no written contract existed that prescribed payment for the service. *Id*.

¶ 85    We note initially that Roberson Construction's written closing argument titles its request as "Section 2-616 (Motion to Amend Pleadings to Conform to the Proof)." Of course, the nature

of a motion is determined by its substance rather than its caption. *Shutkas Elec., Inc. v. Ford Motor Co.*, 366 Ill. App. 3d 76, 81 (2006). The motion directs the trial court to both section 2-616(c) (725 ILCS 5/2-616(c) (West 2016) and section 2-616(a) (725 ILCS 5/2-616(a) (West 2016). As Roberson Construction notes, Section 2-616(a) contemplates the addition of alternative theories of recovery "which may enable the plaintiff to sustain the claim for which it was intended to be brought." *Id.* § 2-616(a). Section 2-616(c) is both broader and narrower, allowing for the amendment of pleadings before or after judgment, but only "to conform the pleadings to the proofs, upon terms as to costs and continuance that may be just." *Id.* § 2-616(c). A careful reading of Roberson Construction's written request to "conform the pleadings to the proof," reveals that it is in substance a request to add the claim of *quantum meruit* so that Roberson Construction might recover under that theory in the event the trial court were to agree with Ellerby's contract interpretation disallowing recovery for the work performed in excess of $150,000. Adding a claim, as opposed to modifying or substituting a claim, arguably implicates section 2-616(a) more directly than 2-616(c). *Id.* § 2-616(a) ("adding a new cause of action").

¶ 86    That Roberson Construction argues both sub-sections 2-616(a) and (c) in support of his motion to amend the pleadings is of no consequence ultimately, however, because the request to amend was made before final judgment. Accordingly, as discussed below, determination of whether the trial court abused its discretion in denying the motion to amend is governed by the factors set forth in *Loyola Academy v. S & S Roof Maintenance, Inc.*, 146 Ill. 2d 263, 273 (1992). *Cf. Tomm's Redemption, Inc. v. Hamer*, 2014 IL App (1st) 131005, ¶ 14 ("But these [*Loyola Academy*] factors apply only to amendments that have been proposed prior to final judgment. After final judgment, a plaintiff has no statutory right to amend a complaint and a court commits no error by denying a motion for leave to amend.").

¶ 87    While a party does not have an absolute right to amend a pleading before final judgment, Illinois has a liberal policy toward granting such motions. *Kay,* 2013 IL App (1st) 112455, ¶ 41. In order to determine whether the trial court abused its discretion in denying leave to amend, courts look to the following factors:  (1) would the proposed amendment have cured a defect in the pleadings; (2) would the proposed amendment have prejudiced or surprised other parties; (3) was the proposed amendment timely; and (4) were there previous opportunities to amend the pleading. *Loyola Academy,* 146 Ill. 2d at 273.   As a general matter, the ultimate question is whether the amendment would further the ends of justice. *Lake County Grading Company, LLC v. Forever Construction Company, Inc.*, 2017 IL App (2d) 160359, ¶ 87.   Given the broad discretion a trial court exercises in ruling on motions to amend pleadings prior to the entry of final judgment, we will not reverse the court's decision to deny a motion for leave to amend a complaint unless the court has abused its discretion (see *Loyola Academy*, 146 Ill. 2d at 273-74), which occurs only when its decision is unreasonable or arbitrary such that no reasonable person would adopt the same view (see *Seymour v. Collins*, 2015 IL 118432, ¶ 41).

¶ 88    In denying the request to amend the pleadings, the trial court noted initially that the first *Loyola* factor was inapplicable. There is a difference between curing a defect and adding additional theories of recovery. See *Perona v. Volkswagen of America, Inc.,* 2014 IL App (1st) 130748, ¶ 33. Roberson Construction's oral motion to amend the pleadings to recover under a *quantum meruit* theory sought to do the latter.  The trial court then addressed some of the remaining *Loyola* factors, noting "the Court finds no reason in the record to believe that [Roberson Construction] was unaware of the facts which came out at trial in order to suggest prejudice or surprise, nor was there any suggestion that there is good cause that [Roberson Construction] did not have ample opportunity prior to trial to amend the pleading."

¶ 89     We agree with the trial court's assessment that Roberson Construction was on notice well in advance of trial that it could have pled *quantum meruit* as an alternative theory to its contract claim.  Roberson Construction filed its complaint on November 30, 2017, alleging Mechanics' Lien and contract claims and seeking damages of $103,583 beyond what Ellerby had already paid.  On January 23, 2018, Ellerby filed a motion to dismiss arguing, *inter alia,* that Roberson Construction could not recover any monies beyond the $150,000 contract price, because the Agreement precluded oral change orders, no written change orders had been authorized, and she had paid the full $150,000.  On March 16, 2018, the trial court granted Ellerby's motion to dismiss all counts without prejudice to replead within 30 days.  On April 10, 2018, Roberson Construction filed its first amended complaint, again alleging Mechanics' Lien and contract claims.  Ellerby filed a new motion to dismiss which, after extensive briefing and argument, was denied on August 15, 2018, and at which time Ellerby was ordered to answer the complaint within 45 days.  Significantly, Ellerby's answer to the first amended complaint, filed on September 28, 2018, asserted as an affirmative defense that she had "paid the contract price in full."  More significantly, on that same date Ellerby filed a counterclaim for breach of contract claiming damages in the amount of $79,708.86, which she contended represented the amount of her overpayment beyond the contract price of $150,000.  Simply put, Roberson Construction was on notice at least from Ellerby's first motion to dismiss filed on January 23, 2018, that the alternative theory of *quantum meruit* might be necessary to recover damages.

¶ 90     Additionally, though not explicitly addressed by the trial court in its written order denying leave to amend the pleadings, we note Ellerby's argument in opposition that the requested amendment at the conclusion of trial would have prejudiced her.  Noting that *quantum meruit* is an equitable claim subject to equitable defenses, she asserts that, by waiting until the close of

evidence to assert this claim, Roberson Construction precluded her from exploring equitable defenses such as unclean hands, laches, and estoppel. She further argues that had *quantum meruit* been claimed in a timely manner, she would have elicited testimony from third parties as to the innate value of services provided by Roberson Construction, which she otherwise did not do.

¶ 91 Considering all the above factors, we conclude that the trial court did not abuse its discretion in denying leave to amend the pleadings to assert a *quantum meruit* claim. Roberson Construction never sought to amend its pleadings to allege a *quantum meruit* claim from January 2018, when Ellerby's first motion to dismiss put it on notice that the alternative pleading might be necessary, all the way through the conclusion of the trial on October 9, 2019. This is significant because a trial court denying leave to amend generally acts within its discretion where the matters asserted were known by the moving party at the time the original pleading was drafted and for which no excuse is offered in explanation of the initial failure. *Freedberg v. Ohio National Insurance Co.,* 2012 IL App (1st) 110938, ¶ 41; *Trans World Airlines, Inc. v. Martin Automatic, Inc.*, 215 Ill. App. 3d 622, 627-28 (1991).

¶ 92 To escape the conclusion that the trial court acted within its discretion in denying the *quantum meruit* amendment, Roberson Construction argues for the first time on appeal, and in the last two sentences of its opening brief: "Pursuant to common law, [Roberson Construction] was not even required to amend the pleadings for a *quantum meruit* claim. The trial court should have allowed the oral Motion simply on the fact that procedurally, a *quantum meruit* theory does not require the pleadings to be amended." In support, it cites *Edens View Realty & Investment, Inc. v. Heritage Enterprises, Inc.,* 87 Ill. App. 3d 480 (1980). Roberson Construction neither advanced this argument nor cited this case in the trial court.

¶ 93    Ellerby responds by noting that this argument is made for the first time on appeal and that the trial court was never asked to so find.  Indeed, we note that Roberson Construction not only did not make this argument to the trial court, but specifically invited the court to instead decide its motion pursuant to section 2-616 of the Code.  "The purpose of this court's forfeiture rules is to encourage parties to raise issues in the trial court, thus ensuring both that the trial court is given an opportunity to correct any errors prior to appeal and that a party does not obtain a reversal through his or her own inaction." *1010 Lake Shore Ass'n v. Deutsche Bank National Trust Co.,* 2015 IL 118372, ¶ 14.  The record before us reveals that Roberson Construction  never argued to the trial court that its *quantum meruit* theory did not require amendment of its pleadings.  Accordingly, Roberson Construction forfeited this argument.  See *Norman v. Brandt,* 397 Ill. App.3d 1074, 1079 (2010) (the plaintiffs forfeited their contention that a section of the Restatement applied to the facts of their case, because they raised that section for the first time on appeal).

¶ 94    Parenthetically, it is not at all clear that *Edens View Realty* was correctly decided.  In *Edens View Realty,* the plaintiff real estate broker alleged that he was entitled to a commission for a real estate closing where he had procured the cause of the sale.  *Edens View Realty,* 87 Ill. App. 3d at 481.  The defendant claimed that the listing contract was void pursuant to the then entitled Real Estate Brokers and Salesmen License Act (Act) (Ill. Rev. Stat. 1977, ch. 111, pars. 5701-5743), because it did not have an expiration date. *Id.* The trial court found that the listing contract was valid and, in the alternative, that the broker could recover under *quantum meruit.  Id.* at 483.  The appellate court held that the trial court erred in upholding the listing contract in contravention of the Act but upheld the *quantum meruit* finding. *Id.* at 484, 487. In response to the defendant's contention that the trial court had erred because the broker had never pled *quantum meruit* below, the *Edens View Realty* court noted: "[I]n Illinois, a plaintiff may recover under *quantum meruit* on

a claim made under an express contract without amendment of the pleadings where the plaintiff fails to establish the express contract but does show that in fact services were rendered. [Citation.] Plaintiff's failure to include *quantum meruit* in its complaint which sought contractual relief, is therefore not fatal to its recovery under this theory." *Id.* at 485.

¶ 95    *Edens View Realty* cites *Slater v. Jacobs*, 56 Ill. App. 3d 636, 638 (1977), which in turn cites *Moreen v. Estate of Carlson*, 365 Ill. 482, 493 (1937), for the proposition that a plaintiff need not plead *quantum meruit* in order to recover under the theory where its express contract claim fails. However, a careful review of the evolution of the Illinois Civil Practice Act suggests that this holding in *Moreen* and its progeny may be at odds with the current iteration of the Act.

¶ 96    The *Moreen* plaintiff filed a claim in the probate court against the decedent's estate by which she sought the allowance of $30,000 for damages resulting from the breach of an alleged agreement between the decedent and her. *Moreen*, 365 Ill. at 483. The probate court allowed the claim in full. *Id.* After a hearing *de novo*, the circuit court found that the plaintiff had failed to establish an express contract, but fixed the value of her services on a *quantum meruit* basis at $728. *Id.* The First District Appellate Court reversed the order of the circuit court and remanded the cause to that court with directions to disallow the claim in its entirety. *In re Estate of Carlson*, 286 Ill. App. 81, 90 (1936). The supreme court affirmed the appellate court's holding that there was no express contract to include plaintiff in the decedent's will but reversed the appellate court's *quantum meruit* holding, noting "it is proper to permit a quantum meruit recovery on a claim made under an express contract." *Moreen,* 365 Ill. at 493. The supreme court did not, however, address the "form" of Moreen's pleadings in the context of the newly enacted Civil Practice Act.

¶ 97    When the *Moreen* plaintiff filed her suit in January of 1934, the revolutionary 1933 Civil Practice Act had just become effective, whereby substantial aspects of the common law were

replaced by statute. Ill. Rev. Stat. 1935, ch. 110; see also Edson R. Sunderland, *Analysis of the Civil Practice Act of 1933, id.* at 2433. This included, for the first time, legislation detailing the purpose and form pleadings should take. The 1933 Civil Practice Act provided that parties could plead as many causes of action as they had, irrespective of whether in law or equity, and that they could plead them "in the alternative." *Id.* at § 43.

¶ 98      Historically, notwithstanding that the new § 43 directed that every complaint shall contain specific prayers for relief, the former chancery practice of including a general prayer for relief still persisted despite the effort to abolish it. *See Civil Practice and Procedure–Survey of Illinois Law for the Year 1947-1948,* 27 Chi. Kent L. Rev. 24, 32 (1948). In 1956, the Illinois Legislature enacted another overhaul of the Civil Practice Act. Ill. Rev. Stat. 1956, ch. 110. Section § 43 of the Act was amended to read, "When a party is in doubt as to which of two or more statements of fact is true, he may, *regardless of consistency*, state them in the alternative or hypothetically in the same or different counts or defenses, whether legal or equitable." (Emphasis added.) *Id.* § 43(2). The drafters of the 1956 Act stated in the Joint Committee Comments that the words "regardless of consistency" were inserted to make clear "that alternative pleading of facts is sanctioned in spite of inconsistencies, removing any doubt in that regard under the present act." *Id.*, Joint Committee Comments, at 514

¶ 99      The evolution of the Civil Practice Act, beginning with the Civil Practice Act of 1933 to present, suggests that the *Edens View Realty* and *Slater* line of cases is on unsure footing. Section 2-603 of the current version of the Civil Practice Act governs the "[f]orm of pleadings" and provides, "Each separate cause of action upon which a separate recovery might be had shall be stated in a separate count ***[.]" 735 ILCS 5/2-603(b) (West 2016). Section 2-613 governs

"[s]eparate counts and defenses" and approves alternative and even inconsistent pleadings where it provides in relevant part:

"(a) Parties may plead as many causes of action, counterclaims, defenses and matters in reply as they may have, and each shall be separately designated and numbered.

(b) *When a party is in doubt as to which of two or more statements of fact is true, he or she may, regardless of consistency, state them in the alternative* or hypothetically in the same or different counts or defenses. A bad alternative does not affect a good one."

(Emphasis added.) 735 ILCS 5/2-613(a), (b) (West 2016). Thus, "Illinois law unquestionably allows litigants to plead alternative grounds for recovery, regardless of the consistency of the allegations, as long as the alternative factual statements are made in good faith and with genuine doubt as to which contradictory allegation is true. [Citation.] Illinois law likewise permits parties to argue in the alternative, even when such arguments are based on inconsistent facts. [Citation.]" *Heastie v. Roberts*, 226 Ill. 2d 515, 557–58 (2007). Indeed, we note that any number of published opinions have observed that *quantum meruit* is used as an equitable remedy to provide restitution for unjust enrichment and is often pleaded as an alternative claim in a breach-of-contract case so that the plaintiff may recover even if the contract is unenforceable. *Weydert Homes, Inc. v. Kammes*, 395 Ill. App. 3d 512, 522 (2009).

¶ 100    Regardless, Roberson Construction never even sought to proceed in the manner suggested in *Edens View Realty*; to the contrary, it affirmatively sought to amend its pleadings pursuant to section 2-616 of the Code. For the foregoing reasons, we cannot say that the trial court's denial of Roberson Construction's motion for leave to amend the pleadings to assert a *quantum meruit* claim was unreasonable or arbitrary such that no reasonable person would adopt the same view.

¶ 101          C. Damages and Attorney Fees Under the Consumer Fraud Act

¶ 102   We last address Ellerby's argument that the trial court abused its discretion when it found Roberson Construction violated the CFA, but awarded damages in the amount of court costs only. We note that Roberson Construction does not contest the trial court's finding that it violated the CFA by a preponderance of the evidence, it but asks that the damages award remain limited to court costs.

¶ 103   Count II of Ellerby's counterclaim alleges in pertinent part that Roberson Construction engaged in deceptive acts and practices under the CFA by failing to provide Ellerby with a consumer rights brochure as mandated by the HRRA and by failing to provide sworn statements as mandated by the Mechanic's Lien Act. Ellerby alleges that these deceptive acts and practices occurred in the course of conduct involving the home repair and remodeling industry and, as a result, she suffered damages in that she had been overcharged and overpaid and was subjected to subcontractors seeking recovery directly from her due to Roberson Construction's failure to pay them. The trial court found Ellerby proved these violations by a preponderance of the evidence. It did not, however, award Ellerby damages or attorney fees. Instead, it awarded Ellerby damages in the amount of court costs only. Each party was to pay their own attorney fees. Ellerby contends that the trial court abused its discretion by not awarding her damages and attorney fees despite proving the violations.

¶ 104   Any person who suffers damages as a result of a violation of the HRRA may bring such action under section 10a of the CFA (815 ILCS 513/30 (West 2016)). "The court, in its discretion, *may* award actual economic damages or any other relief which the court deems proper ***." (Emphasis added.) 815 ILCS 505/10a (West 2016). Section 10a(c) provides that, "except as provided in subsections (f), (g), and (h) [(pertaining to vehicle purchases)] of this Section, in any action brought by a person under this Section, the Court may grant injunctive relief where

appropriate and *may* award, in addition to the relief provided in this Section, reasonable attorney's fees and costs to the prevailing party." (Emphasis added.) *Id.* § 10a(c). Thus, under section 10a(c) of the Act, the decision whether to award attorney fees rests within the sound discretion of the trial court. See *Ekl v. Knecht*, 223 Ill. App. 3d 234, 246 (1991).

¶ 105    The HRRA applies to home repair and remodeling of single-family residences. 815 ILCS 513/10 (West 2016). It requires contractors for any project exceeding $1000 to provide a written contract with the total cost, including materials, "with reasonable particularity." *Id.* § 15. For any contract over $1000, the contractor "shall provide to its customers a copy of the 'Home Repair: Know Your Consumer Rights' pamphlet prior to the execution of any home repair or remodeling contract" with a required acknowledgment of the consumer. *Id.* § 20.

¶ 106    Besides emphasizing to homeowners the need for written contracts and for those contracts to include a description of the work, starting and completion dates, cost of work, and payment terms, the pamphlet also states: "Suppliers and subcontractors have a right to file a lien against your property if the general contractor fails to pay them. To protect your property, request lien waivers from the general contractor." *Id.*

¶ 107    Ellerby argues that had Roberson Construction followed the HRRA by providing her with the brochure, a written contract, or written change orders for every claimed oral modification, as well as a clear list of the names of suppliers and laborers and the amounts due, together with lien waivers on payments by Roberson Construction, the instant litigation would not have transpired. Ellerby notes that Roberson admitted at trial that he knew of the requirements to furnish the pamphlet and that he had copies of it with him when he first met Ellerby but gave no explanation

of why he did not give Ellerby a copy or provide her with the appropriate lien waivers.[2] Ellerby argues further that, but for Roberson Construction's failures, she would not have been faced with liens from at least two of Roberson Construction's subcontractors and would not have had to pay substantial fees to legal counsel to defend an unfounded and unproven lawsuit.

¶ 108   While the trial court found Ellerby had proven violations of the CFA, it further found Ellerby suffered no damages as a result of the failure to provide a consumer rights pamphlet or the failure to provide sworn statements of lien waivers.   The evidence revealed that Ellerby had not received actual liens from the subcontractors Ellerby complains of and, two years after the work had been completed at the farmhouse and after the statute of limitations had run, Ellerby testified there were no lawsuits pending to foreclose any type of lien against her.   The trial court presided over the lengthy pretrial and trial proceedings, heard the testimony of the witnesses, rendered judgment, and ultimately determined in its discretion to award only court costs. Under the circumstances here, and based upon our review of the record, we cannot say that the trial court abused its discretion in denying Ellerby damages and attorney fees.

¶ 109                                    III. CONCLUSION

¶ 110   For the preceding reasons, we affirm the judgment of the circuit court of Ogle County.

---

[2] We decline Ellerby's request to reconsider the trial court's ruling to refuse to admit defendant's Exhibit 11. The exhibit, although not entered in the record, is a "snippet from the Mechanics Lien Act," and the trial court refused to admit it saying the testimony regarding it was clear. The admission of exhibits is largely within the discretion of the trial court. *Little v. Tuscola Stone Company*, 234 Ill. App. 3d 726, 731 (1992).   We cannot say that the trial court's refusal to admit the exhibit was an abuse of discretion given it is set forth in the Mechanic's Lien Act.

¶ 111   Affirmed.